# Richmond

GROVER EARL LUCAS v. COMMONWEALTH OF VIRGINIA.

March 7, 1960.

Record No. 5055.

Present, All the Justices.

The opinion states the case.

*G. W. Reed, Jr.,* for the plaintiff in error.

*A. S. Harrison, Jr., Attorney General* and *D. Gardiner Tyler, Assistant Attorney General,* for the Commonwealth.

WHITTLE, J., delivered the opinion of the court.

This case is before us on a writ of error to a judgment entered by the Hustings Court of the City of Roanoke on March 16, 1959, wherein Grover Earl Lucas, hereinafter called the defendant, was sentenced to death for the murder of his wife, Connie Maxey Lucas.

The record discloses that at the June, 1958, term the defendant was separately indicted for the murder of his said wife; his son, Dennis Freddie Lucas; and his daughter, Mildred Joyce Lucas. He was also indicted for felonious assault upon his stepdaughter, Dorothy Mae Smith. The crimes were alleged in the indictments to have been committed on the . . . . day of April, 1958.

On June 2, 1958, the court appointed G. W. Reed, Jr., an eminently qualified attorney of the Roanoke Bar, to defend Lucas, and on the same date, on motion of the Commonwealth, the court appointed Dr. Charles M. Irvin, a medical examiner for the city, to examine the defendant as to his mental condition.

On June 9, 1958, as a result of the mental examination, the court ordered that the defendant be committed to the criminal insane department of the Southwestern State Hospital at Marion, for observation and further examination into his mental condition.

On August 11, 1958, Doctors Joseph R. Blalock and Charles A. Zeller, superintendent and director respectively of the hospital, made the following report to the court:

"The above-named was admitted to our Criminal Insane Department on June 12, 1958, having been committed by your Court for observation and report.

"Since admission he has been carefully studied and history obtained so far as practical. As a result of our studies and observation we beg to report that he is not now psychotic or insane and has not been psychotic or insane since admission. The official diagnosis is 'Sociopathic Personality Disturbance, Alcoholism (addiction).' He is intellectually subnormal but not to such a degree as to affect his competency.

"The electroencephalogram tracings (brain wave tracings) show some abnormal changes suggestive of epilepsy, but during our period of observation no clinical evidence of epilepsy was observed. It might be stated that about 15 per cent of non-epileptics show abnormal brain waves and that about 15 per cent epileptics show normal brain waves.

"It is felt that this man is mentally competent and able to stand trial and testify in his own defense.

"Attention should be called to the fact that this man was found to have active pulmonary tuberculosis and while here he has been treated with INH 100 milligrams three times a day and PAS tablets, 4 three times a day. With the permission of the Court we placed him in the Tuberculosis Building where this treatment could be instituted and where isolation precautions with reference to active tuberculosis could be followed. We recommend that this be called to the attention of the physician who will have his supervision in jail."

The three murder charges and the felonious assault charge against the defendant were set for trial on September 29, 1958. The Commonwealth elected to try Lucas on the charge of the murder of his wife, whereupon the defendant moved the court to direct the Commonwealth to try him on all four indictments. The motion was overruled and the defendant excepted. The trial began on September 29 and was completed on October 1, 1958.

At the conclusion of all the evidence the defendant moved to strike the Commonwealth's evidence on the ground that the Commonwealth had failed to prove the *corpus delicti*, which motion the court overruled and the defendant excepted. Thereupon the case was submitted to the jury upon the instructions of the court, and on October 1, 1958, the jury rendered its verdict of guilty of murder in the first degree and fixed the punishment at death in the electric chair. Timely motions were made to set aside the verdict on grounds properly assigned, argument was subsequently heard, and the motions denied.

On March 16, 1959, the court entered judgment on the jury's verdict and sentenced the defendant, fixing June 5, 1959 as the date of execution. The sentence was suspended pending appeal by order entered May 14, 1959.

The defendant says the three questions presented on this appeal are:

1. Whether or not the evidence of the Commonwealth should

have been stricken by the trial court upon the motion of the defendant on the ground that the extrajudicial confessions of the defendant were not corroborated by other evidence sufficient to establish the *corpus delicti* beyond a reasonable doubt.

2. Whether or not the trial court abused its discretion in this case in its failure to direct the Commonwealth's attorney to consolidate for trial the four felony indictments pending in the trial court against this defendant.

3. Whether or not the trial court should have given Instructions 17, 18, 19, 20, and 21, offered by the defendant and refused by the court, which instructions sought to have the mental condition of the defendant submitted to the jury.

The evidence regarding the homicide disclosed that the defendant, an unemployed auto mechanic, 46 years of age, was the husband of Connie Maxey Lucas; they had two children, namely, Mildred Joyce Lucas, aged 8, and Dennis Freddie Lucas, aged 11. Dorothy Mae Smith, aged 16, a daughter of Connie Maxey Lucas by a former marriage, also lived with the family in a second story flat. Mrs. Lucas was employed by a laundry company and contributed mainly to the support of the family.

As a result of the absence of Mrs. Lucas from her work, an investigation was made and the following situation was discovered at the Lucas apartment on Monday, April 28, 1958, at approximately 6:15 p.m.:

Police Officer Ford entered the apartment and found lying on the floor the dead body of Dennis. Mrs. Lucas was found dead in her bed in another room. Mildred was found dead in her bed, and Dorothy was lying on her face on the floor beside Dennis, "still alive and moving."

An examination by Dr. Irvin disclosed that the death of Mrs. Lucas and the two children was caused by blows to the head by an "edged instrument". The time of death was established as approximately 6:00 a.m. on Sunday, April 27, 1958.

Soon after this discovery, the defendant was apprehended a short distance from the home and taken into custody by the city police. Fifteen minutes after the defendant arrived at police headquarters he was interrogated and confessed that he had taken a pick and killed his wife and the two children and had struck his step-daughter in the head with the pick in an attempt to kill her.

The defendant gave as his reason for killing his wife, "because

she nagged me", and the reason he gave for killing his two children was because he would be electrocuted for killing his wife and his children would have no place to stay and no one to support them. He said he attempted to kill Dorothy because she stayed out late in the street, smoked cigarettes and would not mind him.

The officers said they did not ask the defendant to sign the confession because he had been drinking and near the end of the interrogation "his tongue seemed to get heavy." A signed confession, in all respects similar to the one first given, was obtained two days later.

The officers found a blood-stained pick behind the curtain in the bathroom where the defendant in his confession said he had placed it. Witness Rucker, the owner of the pick identified by the police officers as the murder weapon, said he kept it under his back steps where the defendant in his confession said he obtained it early on the morning of April 27. The underclothes which the defendant had worn at the time the crime was committed contained numerous stains which Police Captain Allman said "appeared to be blood."

While the record contains one hundred seventy-nine printed pages, the facts above related constitute the main evidence surrounding the commission of the crime.

There is no merit in the first question posed by the defendant, i.e., was the *corpus delicti* established beyond a reasonable doubt. The term "*corpus delicti*" is defined in 5 Mich. Jur., Criminal Procedure, § 54, pp. 400, 401, as follows:

"The corpus delicti is the fact that the crime charged has been actually perpetrated. It is the body or substance of the crime. The corpus delicti consists not merely of an objective crime, but of the defendant's agency in the crime."

· In this instance there is no doubt that the homicide was proved. We are therefore not concerned with the first portion of the definition, but we are concerned with the defendant's agency in the crime. He claims that his extrajudicial confession was uncorroborated by other evidence and therefore the *corpus delicti* was not established. It was held in *Cochran* v. *Commonwealth*, 122 Va. 801, 817, 94 S. E. 329, that the *corpus delicti* may be established by circumstantial as well as direct evidence.

The following circumstances connect the defendant with the crime and corroborate his confession: The mortal wound on Mrs. Lucas' head was inflicted by an "edged instrument"; the pick identified

by the defendant as the murder weapon meets this description; the pick was found where the defendant said he had left it, behind the curtain in the bathroom; Rucker, the owner of the pick, said he kept it under his back steps from whence the defendant said he had gotten it; the medical examiner for the City of Roanoke, Dr. Irvin, testified that Mrs. Lucas was killed about 6:00 a.m. on April 27; the defendant stated that he killed her between 5:00 and 6:00 a.m. on that date; there were blood stains on the defendant's underclothes which he had worn at the time of the crime; the defendant stated that he struck his wife as she slept in the bed, and the officers found her dead where he said he had killed her. All of these facts corroborate the voluntary confession.

It takes only slight evidence to establish the *corpus delicti* when the commission of the crime has been fully confessed by the accused, and in this instance the evidence was amply sufficient. 23 C.J.S., Criminal Law, § 916, pp. 181-185; 26 Am. Jur., Homicide, § 383, p. 425; *Campbell* v. *Commonwealth*, 194 Va. 825, 833, 834, 75 S. E. 2d 468, 473, 474.

The second question, *i.e.*, did the court err in overruling defendant's motion to try the four indictments together, is also without merit. The Commonwealth was under no obligation to try all four of the cases together for the convenience of the defendant. The defendant had no right to select which of the cases should be tried first. That prerogative was vested in the Commonwealth. The record fails to show any abuse of discretion.

The crucial point in the case is raised by the third question which relates to the mental condition of the defendant at the time the crime was committed, and the refusal of the court to instruct the jury on this aspect of the case. It is strongly argued that the mental condition of the defendant was a factual matter which should have been submitted to the jury for its determination.

On the other hand the Commonwealth contended at the trial and contends now that there was no evidence on which to base any instructions dealing with the mental condition of the defendant and that such were properly refused by the court.

The medical evidence in this regard is conflicting. Dr. Hurt, a psychiatrist, examined the defendant on three occasions, diagnosed his mental condition and formed an opinion thereof. He testified that the method employed by him in making his examination was as follows:

"Well, I examined Grover Lucas in the psychiatric examination, interviews. I interviewed some of his relatives for history; I saw his statement he gave to the police; I saw the report from Southwestern State Hospital at Marion; and I reviewed his electroencephalogram tracings that were made at Marion."

The diagnosis of Lucas by Dr. Hurt was "that he is a sociopathic personality; he has personality disturbances; a chronic alcoholic; and he has many findings suggestive of epilepsy." Lucas was described by Dr. Hurt as being "a chronic alcoholic with deterioration," and he said that such a condition is a "disease of the brain;" that chronic alcoholism is "an insanity" and it is "practically an irreversable mental disease."

Dr. Hurt could not state as a certainty whether or not Lucas was amnesic at the time the homicide occurred but he did examine him in an attempt to make such a determination and his testimony in regard to the examination follows:

"Yes, I got a history from him up to—of his drinking and activities up until the 19th of April. And after the 19th of April he gave me nothing. No history whatsoever of what happened or what occurred. He couldn't recall, after repeated and repeated interrogations and every method I knew, what took place from the 19th to the 28th or 29th, and he gave me absolutely no history whatsoever of what occurred. * * But he gave me no history whatsoever. Whether he was amnesic I do not know. I can't definitely say. He couldn't recall it after he was sober, to me."

Dr. Hurt's conclusions after examining the electroencephalogram were the same as those of Doctors Blalock and Zeller, that is, that the tracings suggested an abnormal brain wave. He said, "The way I interpret the electroencephalogram he had certain spikings and wave lengths in there that suggested a seizure, suggested an abnormal brain wave."

In Dr. Hurt's testimony concerning automatism and its relationship to epilepsy, he explained "that is a state that occurs with people before they have a seizure. They may not have a seizure at all, but they have those psychotic episodes." Regarding the psychotic episodes, they were described by Dr. Hurt as "an attack whereas a person does not have a convulsion. He has this mental episode; he becomes wild, confused, irrational, sometimes combative, attacks people around him, makes threats, and violent, and then sometimes they just lie around in a stupor. Certainly in my experience we've

had to keep them secluded in a protective room for several days sometimes. They come out of it on drugs, on medication, and some of them have a hard convulsion and come out of it and get better after having a hard convulsion. Some will come out of it on medication."

In addition to Dr. Hurt's testimony, several witnesses testified to the fact that the defendant was an alcoholic, and there was evidence that he was drinking at the time of the commission of this crime, had been drinking for some time prior thereto, and was intoxicated when arrested by the police officers.

There was evidence of other witnesses, kinsmen of Lucas, that from the time he was five years old until he was eighteen years of age they had seen him suffering with seizures or fits. It was also testified by a kinsman that the defendant's mother and several other members of his family on the maternal side had "convulsions and fits." There was evidence from several officers who had Lucas in custody while he was in jail awaiting trial that he was observed having "some type of spell, or something", and "laying there [on the floor] mumbling."

The Commonwealth contended that Dr. Hurt's testimony was insufficient to justify the court in giving instructions dealing with insanity. It is pointed out that on cross-examination the doctor testified as follows:

"Q. Is he [Lucas] an epileptic?

"A. I do not know.

"Q. You're convinced that he knew what he was doing?

"A. Yes.

"Q. You're convinced he knew the difference between right and wrong?

"A. He does now, I don't know about then.

"Q. There's nothing on which you can base an opinion that he didn't know it then?

"A. No.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. And you can't say—you're certainly saying now that he's completely and totally sane in so far as knowing right from wrong and his ability to carry into execution his plans or anything he wills?

"A. Yes, he's competent now, yes, sir.

"Q. He's competent now. In so far as you know he was competent

on the morning on which this crime was committed, wasn't he so far as you know?

"A. So far as I know he was or wasn't; I don't know.

"Q. You don't know?

"A. No, nobody knows."

The Commonwealth having established the *corpus delicti* and that the act was committed by the defendant, had made out its case, and the burden rested upon the accused to prove to the satisfaction of the jury that at the time of the commission of the act he was insane. This burden rests upon the accused by reason of the presumption of law that every person of the age of discretion is of sound mind.

Having made the defense of insanity, a careful consideration of all the evidence in the record leads to the conclusion, and we so hold, that the defendant was entitled to have the question of his sanity determined by the jury under proper instructions. *Boswell* v. *Commonwealth*, 20 Gratt. (61 Va.) 860, 870; *Dejarnette* v. *Commonwealth*, 75 Va. 867; *Wessells* v. *Commonwealth*, 164 Va. 664, 673, 180 S. E. 419, 422; *Maxwell* v. *Commonwealth*, 165 Va. 860, 865, 866, 183 S. E. 452; *Brenan* v. *Commonwealth*, 183 Va. 846, 849, 850, 33 S. E. 2d 639, 640; *Thompson* v. *Commonwealth*, 193 Va. 704, 712, 70 S. E. 2d 284, 288; Wigmore on Evidence, 3rd Ed., 1940, § 227.

The court did not pass upon the correctness of the instructions offered by the accused dealing with the question of insanity. The ruling was that no instructions on the subject should be given. We hold that this was error. The question should have been submitted to the jury under proper instructions.

For the reasons stated the judgment is reversed and the case remanded for a new trial consistent with the views here expressed.

*Reversed and remanded.*