COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Willis and Bumgardner
Argued at Richmond, Virginia


LARRY JUNIOR CHEATHAM

MEMORANDUM OPINION[*] BY
v.    Record No. 0917-00-2          JUDGE JERE M. H. WILLIS, JR.
                                         AUGUST 28, 2001
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PRINCE EDWARD COUNTY
Richard S. Blanton, Judge

Khalil A. Latif for appellant.

Shelly R. James, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


On appeal from his jury trial conviction of first-degree

murder, in violation of Code § 18.2-32, Larry Junior Cheatham

contends that the trial court erred in refusing to set aside the

verdict because the evidence was insufficient.  For the

following reasons, we affirm the judgment of the trial court.

I.  BACKGROUND

On appeal, we view the evidence in the light most favorable

to the Commonwealth, granting to it all reasonable inferences

fairly deducible therefrom.  See Martin v. Commonwealth, 4 Va.

App. 438, 443, 358 S.E.2d 415, 418 (1987).  The judgment of a

_____

* Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

trial court will be disturbed only if plainly wrong or without evidence to support it.  See id.

On May 13, 1998, eighty-two-year-old Edith Delaney was found dead in the basement of her home.  Her dress was pulled up, and her underwear was down around her ankles.  Dr. Edward I. Gordon, Prince Edward County Medical Examiner, testified that the time of death was approximately 11:00 a.m.  He further testified that a clear fluid, not identified as seminal fluid, was present on Ms. Delaney's anal and vaginal areas.

Dr. Charles J. Lee, an Assistant Medical Examiner for the Commonwealth of Virginia, testified that Ms. Delaney died as a result of a single stab wound to her back from a double-edged knife and that her body displayed no defensive injuries.  He further testified that her vaginal area displayed redness that appeared to result from rubbing and not from forced penetration.

Several witnesses testified that they saw Cheatham in Ms. Delaney's neighborhood on the morning of the murder.  One witness testified that Cheatham wore a "bright fluorescent almost Day-Glow T-shirt."

Officer Edward S. Gates testified that on May 16, 1998, with Cheatham's written permission, the police searched his motel room.  They recovered a yellow T-shirt containing blood stains.  A forensic scientist testified that these blood stains were consistent with Ms. Delaney's DNA profile.

-

During the search of his motel room, Cheatham agreed to answer a few questions. Officer Gates testified that Cheatham denied knowing Ms. Delaney. However, the police had recovered two checks written by her to him for yard work he had done for her. Officer Gates stated that Cheatham later admitted that he knew Ms. Delaney, that he had done yard work for her, and that he had spoken with her several times on the day she died.

Officer Gates testified that when asked whether he had ever been inside Ms. Delaney's house, Cheatham replied that he had never been in her house or her basement. Officer Gates testified that he had never asked Cheatham about the basement. When asked whether he had killed Ms. Delaney, Cheatham replied that "he ha[d] never even cut anybody." Officer Gates then asked Cheatham how he knew Ms. Delaney had been stabbed. Cheatham replied that he did not know that.

Lieutenant Wade Stimpson testified that on June 9, 1998, he and Officer Anthony Q. Ellington arrested Cheatham and advised him of his Miranda rights. Lieutenant Stimpson testified that as they were transporting Cheatham to jail, "tears started flowing down [Cheatham's] cheek," and he said, "[He] did it." Lieutenant Stimpson stated Cheatham told the officers:

> [H]e had gone there on that date to cut her grass hopefully in order to be able to get thirty dollars to buy a lawnmower she had in her basement. Upon arriving there someone else was already cutting the grass so he walked around the neighborhood for a while. After that person left he came back, told

-

> [Ms. Delaney] he was there to purchase the
> lawnmower.  He followed her around to the
> back.  He attempted to buy the lawnmower for
> twenty dollars.  She wouldn't sell it to
> him.  While she was bent over the lawnmower
> he got a knife and he stabbed her.

Lieutenant Stimpson testified that he told Cheatham that Ms. Delaney's underwear had been pulled down to her ankles. Cheatham denied that he had sexual intercourse with her, but said he inserted his finger inside her and masturbated. Lieutenant Stimpson testified that Cheatham said he disposed of the knife he used to stab Ms. Delaney.

Officer Ellington witnessed Cheatham's confession and gave essentially the same account as Lieutenant Stimpson.

Cheatham presented evidence that he had been diagnosed as mildly mentally retarded, is legally blind, and has a partial hearing loss.

Cheatham denied that he killed Ms. Delaney.  He testified that he stopped by her house on May 13, 1998, but left when he saw someone else mowing her yard.  He stated that he came back, noticed the front door open, heard "rumbling" in the basement, went to the back of the house to investigate the sound, and he discovered Ms. Delaney dead.  He testified that he did not call the police because he was scared.  He denied that he confessed to the police.

-

During cross-examination, Cheatham admitted that he had lied to the police and had given them an account different from his testimony.

## II.  SUFFICIENCY OF THE EVIDENCE

Cheatham contends that the evidence was insufficient to prove that he was the criminal agent or that he had the requisite malice, intent, and premeditation to be guilty of first-degree murder.

### A.  CRIMINAL AGENCY

Cheatham first contends that the evidence was insufficient to identify him as the perpetrator of the crime.  We disagree.

Based upon Cheatham's confession, coupled with the corroborating evidence of his presence near Ms. Delaney's house at the time of the murder, his conflicting statements to the police, some of which indicated knowledge of facts only the killer could have known, and the presence of Ms. Delaney's blood on Cheatham's T-shirt, the jury could properly conclude beyond a reasonable doubt that Cheatham killed Ms. Delaney.

### B.  MALICE, INTENT, AND PREMEDITATION

Cheatham next contends that the Commonwealth failed to prove that he acted with the malice, intent, and premeditation required for first-degree murder.  However, he failed to preserve this argument at trial and cannot now raise it on appeal.  See Rule 5A:18.

-

At the close of the Commonwealth's evidence, Cheatham moved to strike the capital murder indictment. He argued that the evidence did not support the homicide-in-commission-of-a-felony element of capital murder and that the evidence did not support the object sexual penetration charge. The motion was denied.

Cheatham's motion to strike at the conclusion of all the evidence and his closing argument raised only the issue of criminal agency, not whether intent, premeditation, and malice had been proved. His motion to set aside the jury's verdict was based solely on issues raised in the pre-sentence report. Therefore, Cheatham is barred from presenting any argument related to any element of first-degree murder except criminal agency. The record provides no reason to invoke the good cause or ends of justice exceptions to Rule 5A:18.

We affirm Cheatham's conviction of first-degree murder.

Affirmed.

-

Benton, J., dissenting.

The rule is well established in Virginia that a conviction for a criminal offense may not rest only on an uncorroborated extrajudicial confession.

> "Extrajudicial confessions of the accused are competent evidence tending to prove the corpus delicti. But the corpus delicti cannot be established by such a confession uncorroborated by other evidence. In other words, a conviction in a criminal case is not warranted by the extrajudicial confession of the accused alone. The confession must be corroborated in a material and substantial manner by evidence aliunde of the corpus delicti."

Phillips v. Commonwealth, 202 Va. 207, 210-11, 116 S.E.2d 282, 284 (1960) (citation omitted). Establishing the corpus delicti "involves the proof of two distinct propositions: first, that the act was done; and secondly, that it was done by the person charged." Nicholas v. Commonwealth, 91 Va. 741, 750, 21 S.E. 364, 367 (1895). See also Claxton v. City of Lynchburg, 15 Va. App. 152, 154, 421 S.E.2d 891, 893 (1992) (noting that "[t]he term corpus delicti, meaning 'the body of a crime,' refers to 'the objective proof or substantial fact that a crime has been committed' . . . [and] 'ordinarily includes two elements: the act and the criminal agency of the act'"). Thus, even when "there is no doubt that the homicide was proved . . . [, the definition of corpus delicti requires that we be] concerned with [corroboration of] the defendant's agency in the crime." Lucas

-

v. Commonwealth, 201 Va. 599, 603, 112 S.E.2d 915, 918-19 (1960).

When the evidence establishes only a suspicion or a probability of guilt, it is insufficient as a matter of law to support a conviction. Tarpley v. Commonwealth, 261 Va. 251, 257, 542 S.E.2d 761, 764 (2001).

> Fundamental principles applicable here should be reviewed. To justify conviction of a crime, it is insufficient to create a suspicion or probability of guilt. Rather, the burden is upon the Commonwealth to prove every essential element of the offense beyond a reasonable doubt. "The evidence must exclude every reasonable hypothesis of innocence and be consistent only with the guilt of the accused."

Moore v. Commonwealth, 254 Va. 184, 186, 491 S.E.2d 739, 740 (1997) (citations omitted).

Four weeks after Edith Delaney was killed, the police arrested Larry Junior Cheatham, a mentally retarded man, and charged him with murder while committing a robbery. During the interval between Delaney's death and Cheatham's arrest, the police questioned Cheatham at least six times and made no audio or video record of any of those interviews, some of which lasted 45 minutes. In most instances the details of those interviews were established only by the testimony of police officers from their memories. Although the officers testified that Cheatham denied in all those pre-arrest interviews that he killed Delaney, the record contains only a summary of Cheatham's

-

responses during those interviews and does not contain, except in one instance, the questions he was asked.  Thus, the record fails to disclose what information about Delaney's death the police conveyed to Cheatham during those interviews.  The conviction in this case is based upon the police recitation of statements they said Cheatham orally gave after they arrested him and were delivering him to jail and upon circumstantial evidence that fails to corroborate that Cheatham was the killer.

At trial, Officers Stimpson and Ellington testified that they arrested Cheatham on the charge of capital murder arising from the death and robbery of Delaney.  During the arrest, the officers brandished their weapons and told Cheatham "the punishment could be the electric chair."  After a magistrate denied Cheatham bail, the officers drove Cheatham to the regional jail.  After they passed Cheatham's residence and approached the jail, Cheatham began to cry.  The officers testified that Officer Ellington told Cheatham "if there is something you want to tell us, you need to tell us now."  Both officers testified that Cheatham then said "I did it."  They testified that "each time he would make a statement [they asked him additional questions] in order to clarify what he was talking about to make sure there was no misunderstanding."  Officer Stimpson testified as follows:

> For example, I asked him to give me the
> whole story about what had occurred.  He
> stated he had gone there on that date to cut

-

her grass hopefully in order to be able to get thirty dollars to buy a lawnmower she had in the basement.  Upon arriving there someone else was already cutting the grass so he walked around the neighborhood for a while.  After that person left he came back, told [Delaney] he was there to purchase the lawnmower.  He followed her around to the back.  He attempted to buy the lawnmower for twenty dollars.  She wouldn't sell it to him.  While she was bent over the lawnmower he got a knife and he stabbed her.

Both officers testified that Cheatham initially did not say anything in his narrative about other events.  For example, Cheatham said nothing about a robbery and said nothing about Delaney's clothing.  Both officers testified that Officer Stimpson first raised the issue of sexual assault.  He "told . . . Cheatham that when [they] discovered . . . Delaney's body her underpants had been pulled down and were only remaining on one ankle on her leg."  When Cheatham was unresponsive to Officer Stimpson's inquiry about what then happened, Officer Stimpson "asked if he did have sex with her."  When asked about his testimony at the preliminary hearing, Officer Stimpson testified as follows:

> Q.  Let me read the question again:  When you said did you have sex with her, did he say no and then stop and then you ask another question?
>
> What was your response?
>
> A.  I said, no.  He said -- I said, I don't recall.  It's a possibility I said, well, why were her pants down if you didn't have sex with her?  And he may have said in

-

response to that that he stuck his finger in
her.

Q. May have said? So on this day you're
testifying he may have said that he had put
his finger in her?

A. I hadn't thought about this part of it
at that point in time until it came up. At
that point in time I said he may have said,
but today I'm saying after proper
recollection I know he said it.

The officers did not seek to obtain a recording of Cheatham's statements and did not ask him to sign a statement. Instead, they later prepared a summary of his statements. Officer Stimpson used a narrative report to describe his questioning of Cheatham and typed the report to "clean it up a little." Cheatham was later charged with murder while in the commission of sexual object penetration. At trial, Officer Stimpson testified from his memory to other statements he said Cheatham made that day. Officer Ellington also testified that he "made an overall summary" and "did not write the questions down." He testified that he "just wrote a summary of basically what Mr. Cheatham had said."

The Commonwealth's other evidence proved that Delaney bled to death from an internal hemorrhage caused by a stab wound through her back that severed her aorta. The assistant medical examiner testified that Delaney could have been stabbed while the assailant was standing in front of her or to her side, and not just from behind. He also testified that bruising on her

-

chin indicates she could have been held or struck on her chin by the assailant. He testified that from the physical evidence there was no way to know whether she was bending or standing when she was stabbed.

Although the police officer testified that Cheatham said he "stuck his finger in [Delaney]," no evidence confirmed that event occurred. The assistant medical examiner testified that penetration was "unlikely because the microscopic [examination] showed no acute injury in that area." He also testified that there were no lacerations or contusions to Delaney's genitalia and that the "3/8 inch pink discoloration" on her genitalia, which was referenced in the autopsy report, "was a chronic rubbing type of an injury rather than an acute injury." In addition, the evidence does not establish the identity of the "clear fluid that was not natural" which was found at Delaney's "anal area and the perivaginal area or outside the vaginal area." Although a certificate of analysis, "indicated the presence of blood on the anal swab and on the underpants," those circumstances were not explained. Thus, the evidence does not eliminate the possibility the fluid was applied by Delaney earlier that day before her death to alleviate personal discomfort.

Near Delaney's body, the police found a comb with hairs from a person not of her race. A photograph showed it partially beneath her dress on the floor. A forensic scientist who tested

-

the hairs on that comb for the police testified that the hairs were not consistent with Cheatham's hair.  He also testified that he recovered "a characteristically Caucasian body hair" from Delaney's underpants.  That hair could not have been Cheatham's.  Although the police recovered partial fingerprints from the basement, they were "unidentifiable."  Indeed, the evidence found on or near Delaney and in the house did not connect Cheatham to the killing and tended to indicate the presence of another person.

The police did not recover the instrument used to stab Delaney.  The medical examiner's report notes that Delaney's wound "is a 3/4 inch stab wound, the inferior edge is sharp and there are two sharp ends superiorly," and it identifies the instrument causing the wound as a "suspect knife."  The assistant medical examiner testified that the wound could also indicate that the instrument was consistent with "a double-sided well sharpened knife."  No evidence proved Cheatham ever owned an instrument that would make a wound of this shape.  Put simply, the Commonwealth's own evidence raises the hypothesis, which was not disproved, that another person killed Delaney.

None of the evidence tends to corroborate the statements the police officers attributed to Cheatham orally identifying himself as the killer.  In Phillips, the Supreme Court overturned a conviction because insufficient evidence other than a confession supported the conviction.  The Court reiterated the

-

well established "'rule in criminal cases . . . that the coincidence of circumstances tending to indicate guilt, however strong and numerous they may be, avails nothing unless the corpus delicti . . . be first established.'" 202 Va. at 211-12, 116 S.E.2d at 285 (citations omitted). The Court ruled that a conviction cannot stand when the corroborating evidence "is just as consistent with non-commission of the offense as it is with its commission." Id. at 212, 116 S.E.2d at 285.

It is not sufficient that the evidence merely establish that a crime was committed because "'[t]he corpus delicti consists not merely of an objective crime, but of the defendant's agency in the crime.'" Lucas, 201 Va. at 603, 112 S.E.2d at 918 (citation omitted). An obvious purpose of the rule is to avoid punishing a person for a crime that person never, in fact, committed. Jefferson v. Commonwealth, 6 Va. App. 421, 424, 369 S.E.2d 212, 214 (1988) (citation omitted). These principles have heightened importance here because "[t]he concern in a case involving a defendant of subnormal intelligence is one of suggestibility." Jurek v. Estelle, 623 F.2d 929, 938 (5th Cir. 1980).

> We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the "confession" will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation.

-

<u>Escobedo v. Illinois</u>, 378 U.S. 478, 488-90 (1964) (footnotes omitted).  Reliable research supports the conclusion that mentally retarded persons process information in a way "that even when a mentally retarded suspect's responses appear normal, his answers may not be reliable."  <u>State v. Moore</u>, 364 S.E.2d 648, 655 (N.C. 1988).  "Persons who are mentally retarded are described as having 'significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.'"  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 308 n.1 (1989) (citation omitted).

Cheatham does not dispute that he went into Delaney's basement the day she was killed.  He testified that he spoke with Delaney earlier that morning when he was walking about town seeking to find odd jobs.  He had previously cut her grass for pay and went to her residence that day seeking to cut her grass.  The evidence also proved he sought to do casual labor, such as cutting grass, for two of Delaney's neighbors that same morning.  Cheatham testified that after he first spoke to Delaney, he returned to ask about purchasing her old lawnmower, which the evidence proved was in her basement near her newer mower.  He testified that when he called to her from her front screened door he heard a "rumbling" in the basement, which he said "sounded like somebody was making a lot of noise."  He went

-

around to the basement door and entered the basement to look for Delaney.

The assistant medical examiner testified that because Delaney suffered from an internal hemorrhage after being stabbed, she would not have died instantaneously. He said "it would have taken a few seconds, maybe a couple of minutes [for Delaney] to bleed that much" and die. The evidence does not disprove that Cheatham heard Delaney moving in the throes of dying.

Cheatham testified that when he went into the basement, Delaney was on the floor. Cheatham, whose eyesight is so deficient that he is legally blind, testified that after he saw Delaney, "I [knelt] down. Some blood or something was running down in the floor, and I [knelt] behind her to see was she breathing." As mentioned by the majority, two "tiny" stains of Delaney's blood were found on a T-shirt recovered from Cheatham's home. These stains, however, serve to corroborate the defense's theory of the case because the presence of the stains are consistent with Cheatham's testimony that he kneeled near her body, detected she was not breathing, saw blood, and then left. He said he did not contact the police because he had not been in that situation before and was afraid.

Cheatham also testified that although he knew the magistrate "said [he] didn't have no bond," he did not understand the consequence of that. He thought he was going

-

home. Cheatham, who had never before been arrested, became upset when the police officers drove him past his residence while going to jail. He began to cry. He testified that Officer Stimpson began roughly talking to him and demanding answers. Cheatham said he did not remember their questions and did not remember making the responses they attributed to him. Cheatham said he "won't answering any questions . . . just shaking, nodding [his] head."

Cheatham denied killing Delaney and, except for the police officer's recitation of Cheatham's statements while crying, the record establishes Cheatham has consistently denied killing her. Indeed, when he was asked by Officer Gates during a pre-arrest interview whether he killed Delaney, Cheatham responded "that he has never even cut anybody." (Emphasis added). That statement is only assertion with an idiomatic intensive that Cheatham had not ever injured anyone with a weapon.

The evidence proved that Cheatham, who was thirty-five years old when these events occurred, has not been convicted of any criminal offense. Cheatham's mental retardation is well documented. His cognitive disability was identified "as early as first grade." He has an IQ that is in the lowest first, second, or third percentile of the population. Cheatham's IQ records indicate his lowest ability was in "social comprehension; in other words, the ability to understand social situations." He is weakest in verbal skills, which the record

-

establishes are "skills . . . that . . . [involve] the ability to understand verbal information, remember it and use it, vocabulary, knowledge about the world, social comprehension, knowing what to do in social situations."

The record clearly established that the anxiety of arrest and immediate realization of incarceration produced responses from Cheatham that caused him to cry. Cheatham had no familiarity with the criminal justice system. Although the officers testified that Cheatham verbally gave inculpatory statements in this condition of distress, no evidence corroborates that he killed Delaney. Moreover, this is not a case in which it can be said that Cheatham "had confessed to the crime not in a general manner, but as one who was familiar with the minutiae of its execution." Washington v. Murray, 4 F.3d 1285, 1292 (4th Cir. 1993). As the Supreme Court noted in Burrows v. Commonwealth, 224 Va. 317, 295 S.E.2d 893 (1982):

> Based on the evidence as a whole, the Commonwealth did not prove beyond a reasonable doubt [Cheatham] was the criminal agent. The most that can be stated is that the evidence created a suspicion [he] was the perpetrator. "Suspicion, however, no matter how strong, is insufficient to sustain a criminal conviction."

Id. at 319-20, 295 S.E.2d at 895 (citation omitted).

For these reasons, I would reverse the conviction.

-