COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Humphreys and Senior Judge Coleman
Argued at Chesapeake, Virginia


KUTURAH ALDRIDGE

v.        Record No. 1553-03-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE ROBERT J. HUMPHREYS
DECEMBER 28, 2004


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Junius P. Fulton, III, Judge

Bruce C. Sams (Sams & Scott, on brief), for appellant.

Margaret W. Reed, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


Kuturah Aldridge appeals her conviction, following a bench trial, for first-degree murder,

in violation of Code § 18.2-32.  Specifically, Aldridge contends that the trial court erred in:

(1) denying her motion to suppress statements she made to police, arguing that she made the

statements while she was in custody but before she was advised of her rights pursuant to Miranda

v. Arizona, 384 U.S. 436 (1966); (2) holding that the Commonwealth presented sufficient

corroborating evidence to prove the *corpus delicti* of homicide; and (3) finding that the evidence

was sufficient to show that she acted with premeditation and malice.  For the reasons that follow,

we disagree and affirm her conviction.

I.  Background

On October 28, 2001, Aldridge, then an eighteen-year-old student at Norfolk State

University, was staying in a hotel room with her boyfriend.  At that time, Aldridge was

approximately nine months pregnant, but she had concealed the pregnancy from her boyfriend –

the baby's father – as well as her family, roommates, and other acquaintances.  At around 2:00 in

the morning, Aldridge began to experience labor pains. Without waking her boyfriend, she went into the bathroom, where she gave birth to a baby girl. After delivering the placenta, Aldridge tied off the infant's umbilical cord. At that point, the infant was bluish-gray in color and was not crying, but she was moving her arms and legs.

Aldridge then began to run a warm bath. Once she had partially filled up the bathtub, she picked up the baby and leaned over the bathwater. After Aldridge started to bathe the infant, however, she let the baby slip off of her arm and into the water. The infant was submerged underwater for "about a minute." Aldridge then removed the baby from the bathwater and "started pressing on [the baby's] heart." Aldridge was unable to revive the infant. She wrapped the baby's body in some hotel towels, and, after waiting for a "couple of minutes," she placed the infant and the towels inside a gray book bag. Aldridge proceeded to clean the bathroom floor "by us[ing] towels to wipe it up, and then [] put[ting] soap on the floor to wipe it." She discarded the used towels "in the dumpster outside."

After Aldridge's boyfriend woke up, he took her back to her dormitory room. Once she returned to her room, Aldridge placed the book bag containing the infant's body inside of a gray trunk. She placed the trunk inside of her closet. Three days later, Aldridge rented a storage unit at Uncle Bob's Self Storage. She left the trunk, which still contained the book bag and the infant's body, inside of the storage unit.

The day after she left the trunk in the storage unit, Aldridge went to the emergency room at Norfolk General Hospital, where she sought treatment for vaginal bleeding. Aldridge's medical records from the emergency room indicate that she told the nurses that she "gave the baby up for adoption."

When she rented the storage unit, Aldridge only paid for a thirty-day rental. In early December of 2001, the storage facility began sending renewal notices and follow-up letters to

Aldridge. When she failed to respond, the contents of the storage unit were deemed abandoned. On February 12, 2002, an employee of the storage facility unlocked the unit in order to inventory its contents for auction. The gray trunk was the only item in the unit. The employee opened the trunk and found the badly decomposed body of the infant still inside of the book bag. She also found several hotel towels and a bathmat that appeared to have been stained with body fluids and tissues.

On February 13, 2002, at approximately 6:00 in the evening, Detectives B.A. Huffman and D.A. Newman contacted Norfolk State University Sergeant Kevin Genwright and asked to speak with Aldridge and any other occupants of her dormitory room. Sergeant Genwright, however, informed the officers that the university had a policy providing that whenever an "outside agency" came to the university "inquiring about a student," university police would "tak[e] care of it, as far as the gathering of the student or going to find the students." Accordingly, Sergeant Genwright told Detectives Huffman and Newman that he would prefer to go to the dormitory room to collect the students without the officers present. The detectives agreed, and they left the campus.

Sergeant Genwright, accompanied by a residential assistant and another member of the university police force, went to the dormitory room and knocked on the door. Sergeant Genwright was dressed "in a shirt and tie," and Officer Bryant – the other member of the university police – was "in uniform." Aldridge and Tia Jackson, one of her roommates, answered the door. Sergeant Genwright told the students "that a Norfolk detective would like to speak to them down at the Norfolk Police Operations Center on Virginia Beach Boulevard." He asked Aldridge and Jackson if they would go with him to the center, and the students said that they would come along.

On their way to the center, Aldridge rode with Sergeant Genwright in his unmarked university police vehicle, and "she sat in the front seat with [him]." Jackson rode with Officer Bryant. During the ride, Sergeant Genwright gave Aldridge his "card" and told her that "they just want to talk to you," but that he didn't "know what it's about." He also told her, "Once they finish, just give me [or headquarters] a call . . . and we'll come pick you up." Aldridge was not handcuffed, and she was not under arrest at that point. At the suppression hearing, Sergeant Genwright testified that the situation was different from an arrest because, "[i]f someone was under arrest, they would be placed in handcuffs and sit in the backseat," and "another officer would have ridden with [him] because [university police officers] don't have cages in [their] vehicles."

Once Aldridge and Jackson arrived at the center, Detective Huffman "introduced [himself] to both young ladies," and he "[j]ust told them that [the officers] wanted to speak to them." Huffman escorted Aldridge and Jackson into the back of the facility and placed them in separate, unlocked rooms. Huffman "told them both that [the officers would] be there to talk with them in a short period of time." The detectives then told Aldridge that they were going to shut the door to her room "[b]ecause [they] were speaking to other people out in the hallway, and [they] advised her that she couldn't just walk about freely because it is a secured facility and somebody would say something to her, but that she could easily knock and . . . [they would] do anything that she needed." The officers were not sure at this point whether a crime had been committed. At the suppression hearing, Detective Huffman testified that Aldridge was not under arrest and that she could have requested permission to leave at any time. Also, because the officers still "didn't know whether she was involved," they "did not advise her of her rights at that time."

After separating the students, the detectives spoke with Jackson first. Then, at approximately 6:38 p.m., Detectives Newman and Huffman entered Aldridge's room. They "offered her food and drink and even cigarettes if she wanted." The detectives then told Aldridge "what [they] had been doing all morning starting with finding contents in a trunk at Uncle Bob's Storage Unit," and "[a]dvised her of what [they] had found there and that [their] investigation had led to speaking with her and her roommates." Almost immediately, "[Aldridge] began to cry stating that her – basically that she felt like her life was over, that she had done something wrong." In an effort "to find out what she [] mean[t] by that," the officers asked Aldridge "if she had been pregnant or had given birth at any time." Aldridge confirmed that she had been pregnant, and she then "went on to go into detail about the fact that she had given birth to a child that she thought was stillborn, that the child had never been born alive." Aldridge also told the detectives that, after the birth of the child, "she then panicked, and she was so afraid to let her parents know anything, that's why she concealed everything." The officers "talked to her about that for a little while before exiting the interview room" at approximately 7:10 p.m. Throughout the interview, Aldridge appeared to be "distraught."

About forty minutes later, the officers re-entered the room and "immediately went over her legal rights." The officers gave Aldridge a rights waiver form, which she reviewed and initialed, writing in "a 'yes' [beside] each right" to indicate that she understood her Miranda rights and that she was voluntarily waiving those rights. Aldridge then "told [the officers] that she did indeed want to continue talking to us about what had happened." The officers continued to interview Aldridge about the birth of the child, and "basically she came to a point where she stated that, in fact, when she gave birth, that the baby was moving."

After it was apparent that Aldridge's story had changed, the officers brought in "a tape recorder and advised her again that [they] were just going to take a taped statement of what she

had already told [them]." Aldridge "had no problem doing that." At trial, Detective Huffman testified that the officers did not tape Aldridge's initial statements to the police because "[w]hen [they] first began speaking with her, [they] didn't know whether she had anything to do with this incident at all." Detective Huffman also testified that they did not tape Aldridge's statements immediately after they read Aldridge her Miranda rights because "at that point it was a misdemeanor case," and "[i]t wasn't until she admitted that the baby was born alive that [they] knew that [they] had to go to the next level."

During the taped statement, Detective Newman asked Aldridge whether, "[w]hen [she] gave birth and [she was] on the floor, when the baby came out was the baby still alive?" Aldridge responded, "Yes." The officers then asked, "How do you know that?" Aldridge responded, "Because her arms and legs were moving." Aldridge maintained, however, that the baby did not "make any noise or cry," but "was just moving her arms and legs." Aldridge also confirmed that the baby was "still moving" after she tied off the umbilical cord.

Aldridge then told the officers that she

> put [the baby] in the tub to rinse her off, and then [she] let her go because [she] didn't know what to do. And then [she] felt bad and [she] didn't want [the baby] to die, so [she] picked her back up and [she] placed her on the floor and [she] started pressing on [the baby's] heart, and then [she] wrapped [the baby] up in a towel and put her in a bag.

Aldridge also said that she left the infant submerged underwater because she "thought it was an easy way out." Aldridge told the officers that she thought submerging the baby would be an "easy way out" because "people wouldn't be ashamed of [her] or hate [her], and [she] thought that was the best way." But "then [she] felt that it wasn't [the best way out], and [she] picked her back up." Officer Newman asked Aldridge, "When you placed her in the water and submerged her, at that point was she alive?" Aldridge responded, "Yes."

- 6 -

Officer Newman also asked Aldridge, "[W]hen you let her go and she was submerged in the water, were you aware that these actions could lead to her death?" Aldridge responded, "Yes." She changed her mind "[b]ecause [she] didn't care what people thought and [she] wanted [the baby]." Aldridge also told the officers that she did not call 911 because she "didn't want anybody to know."

After Aldridge gave the taped statement, the officers transcribed the statement and then "went over the statement with her." The officers "[a]llowed her to read each page at which time she would initial each page and note any corrections." Aldridge made a total of five corrections to the transcript. Once Aldridge had reviewed the transcript, she "signed the back" of the statement. The interview concluded at 12:47 a.m. on February 14, 2002.

After giving her statement to Detectives Huffman and Newman, Aldridge was arrested for "willfully, deliberately, and with premeditation kill[ing] and murder[ing] Jane Doe (infant) in the first degree." A grand jury indicted Aldridge on June 5, 2002, charging that "[o]n or about October 28, 2001, in the City of Norfolk, Kuturah Aldridge did willfully, deliberately and with premeditation kill and murder Baby Girl Aldridge," in violation of Code §§ 18.2-30, 18.2-32, and 18.2-10.

After her arrest, Aldridge spoke with a Child Protective Services worker, Darlene Griffith. During this interview, Aldridge essentially reiterated the story she had told to Detectives Newman and Huffman. Specifically, Aldridge told Griffith that, when the baby was born, "the infant didn't cry but was moving her arms and legs" and that "the infant was bluish and she had flakes on her face." Aldridge also told Griffith that, when she began to bathe the baby, the "[c]hild did not make [any] noise but she was moving a little bit." At that point, Aldridge said "she became scarred [sic] and panicked and didn't know what to do," so she let "the infant slide off of her left arm and into the bath water." Aldridge told Griffith that she then

changed her mind and "picked the infant from the bath tub," but, at that point, "the infant was not moving." Aldridge said that she then "placed the infant on a towel on the bathroom floor" and "she began pressing on the infant's heart and blew into the infant's mouth." However, "the infant was unresponsive," and so "she picked the infant from the floor and placed her over her lap onto her stomach," and then began "patting the infant on her back lightly as [the] infant laid across her lap." When Aldridge's efforts to revive the infant failed, she told Griffith that she "placed the infant wrapped in the towel in a . . . book bag," and "placed the placenta in the bag with the infant." She also told Griffith that "she did not want her parents to know about her pregnancy because she believed they would be ashamed of her." Griffith noted that Aldridge "was extremely emotional and sobbed during the entire interview process."

Before trial, Aldridge moved to suppress her taped statement, contending that Detectives Huffman and Newman failed to read the <u>Miranda</u> warnings to her before she made her initial statement to the police. Aldridge argued that she was in custody for <u>Miranda</u> purposes before the interrogation began, and, because her initial, pre-warning statement to the officers ultimately led to the incriminating, post-warning statement, the taped statement was involuntary and, therefore, should be suppressed.

At the suppression hearing, Aldridge claimed that no one ever told her that she was free to go or that she could leave at any time. She also testified that she did not think that she had any choice but to speak with the detectives because she knew "what [she] [was] going there for." Aldridge stated that, at the beginning of the questioning, Detective Huffman "[s]aid that it was okay to talk to him and that he knows what happened, and [she] shouldn't be afraid to talk because he's here to help [her]. And all he wanted to do is help [her]." Aldridge did concede that she was not afraid that the officers were going to hurt her. However, on redirect, she also

testified that Officer Newman told her "he knew what happened and that [she] didn't have a choice [whether] to tell him what happened."

The trial court denied the motion to suppress the statements, finding that Aldridge was not in custody for purposes of <u>Miranda</u> when she gave her initial statement. The court also concluded that Aldridge made both statements voluntarily and that the statements were therefore admissible under the holdings in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), and <u>Pruett v. Commonwealth</u>, 232 Va. 266, 351 S.E.2d 1 (1966).

At a bench trial on the merits, Dr. Kinnison, the medical examiner who performed the autopsy of the baby's body, testified that her examination of the infant had been limited because of the decomposition of the baby's body. Dr. Kinnison did testify, however, that she was able to ascertain that the baby was born full-term and that she "didn't find any birth defects on the baby." Dr. Kinnison noted that she could not find any evidence of internal or external injuries, and she did not find any toxic substances (e.g., alcohol, cocaine, or opiates) in the baby's bloodstream. Dr. Kinnison also testified that she did not find any evidence of a heart defect during the autopsy, but she clarified that her "examination [of the heart] was somewhat limited by the decomposition." Dr. Kinnison further testified that "[t]he lungs floated in water, which is sometimes done to determine whether a baby was born alive or dead," but she stated that "[i]n this case, it really doesn't matter that the lungs float, because . . . [she] would have expected them to float from decomposition." Dr. Kinnison concluded that, "[b]ased partly on the autopsy finding and partly on the police investigation, the cause of death . . . [was] in [her] opinion, drowning."

Dr. Kinnison also explained that a "finding of drowning [is] nonspecific in all cases" because, for example, "[w]ater in the lungs can . . . [also indicate] a condition in which somebody has heart failure, and the lungs can fill up with fluid," and "[w]ater in the stomach

may [also indicate] that somebody's taken a drink of water." Accordingly, Dr. Kinnison testified that "[t]here are no specific findings to drowning," but rather, "[d]rowning in general is a combination of an examination of a body in addition to circumstances." Under these circumstances, Dr. Kinnison explained that her final diagnosis of drowning was supported by the lack of "any injuries . . . [or] abnormalities" in this "full-term infant" and that the lack of injuries and birth defects "play[ed] a part in [reaching her conclusion]." However, although Dr. Kinnison "found nothing inconsistent with the diagnosis of drowning," she admitted that "[t]here could be other explanations."

On cross-examination, Dr. Kinnison admitted it was "fair to say" that "without [the] information [] provided by the police," she would not have been able to determine if the baby had been born alive, nor would she have been able to determine how the baby died. Accordingly, she conceded that, without the statement that Aldridge gave to the police, she would have found that "the cause of death was undetermined."

Darlene Griffith, the social worker, testified that while Aldridge "was describing [to her] what happened in the bathroom on that day," Aldridge never said "that the baby was not moving," nor did she indicate that the baby was not breathing. Griffith also testified that she "never [received] a police report" for this case and that she did not discover that the infant had possibly been drowned until she interviewed Aldridge.

Contrary to her previous statements to the police and to social services, Aldridge testified at trial that she thought the baby was already dead when she placed her in the water and that she put the infant in the bath "[b]ecause maybe if [she] [c]ould wet her, maybe she[] [would] shock and wake up." When the baby did not wake up, Aldridge stated that she "panicked and let go because [she] thought [the baby] was gone," and then "[she] picked her up because [she] thought, well, maybe if [she] tr[ied] something else, [the baby] would wake up." Aldridge

testified that she did not call the police after she realized that the baby was dead "[b]ecause [she] was scared that they would think that I did it and that I would hurt her." Aldridge also stated that she put the trunk containing the infant's body in the storage unit to give the baby "a space," much like others "have a room where they keep the casket."

Aldridge also testified that the Commonwealth had mischaracterized her statements to the police and to the social worker. Specifically, Aldridge stated that she told them that the baby "did move," not that the baby "was moving." Aldridge testified that her taped statement to the police – in which she stated that the baby was still alive when she placed her in the bathwater – was a result of her own confusion:

> I told him that I'd given birth and that I didn't – when she came out, I didn't believe that she was alive and that I got scared and panicked. And then he was saying, well, you know, did she do anything? And I said, well, her arm moved a little. And he said, well, if her arm moved, then obviously that meant that she was alive, and I was like, no, because she wasn't crying. And he said, well, sometimes babies have a late reaction and they won't cry but they'll move. And then he said, well, if she moved, then she must have been alive. So I got scared. I was like, well, maybe he's right.

Aldridge explained that she did not change her testimony in the police transcript after reviewing that document because the police were pressuring her, and "[b]ecause at the time, [she] [] believ[ed] that they were right, that [the baby] was alive."

At the conclusion of the Commonwealth's evidence, and again at the conclusion of her own case, Aldridge moved to strike the Commonwealth's evidence, contending that the evidence was insufficient to prove the *corpus delicti* required for a homicide. She argued that, because Dr. Kinnison was unable to medically determine when and how the baby died, or even whether the baby was born alive, Aldridge could not be convicted of murder. Aldridge further asserted that there was no evidence of willful premeditation or malice, which are necessary prerequisites to a finding of first-degree murder. After taking the matter under advisement, the trial court

- 11 -

convicted Aldridge of first-degree murder on February 20, 2003, and sentenced her to twenty years incarceration, with all but three years suspended.[1]

This Court initially granted Aldridge's appeal on the issue of whether the evidence was sufficient to support her conviction for first-degree murder. After filing her initial brief, Aldridge petitioned this Court for permission to brief the additional question of whether the trial court erred in denying Aldridge's motion to suppress her statements, in light of the United States Supreme Court's recent decision in <u>Missouri v. Seibert</u>, 124 S. Ct. 2601 (2004). We granted her petition, and this appeal follows.

## II. <u>Analysis</u>

On appeal, Aldridge raises three separate assignments of error. First, Aldridge contends that the trial court erred in denying her motion to suppress, arguing that her initial statements to the police were made while she was in custody but before she was advised of her <u>Miranda</u> rights. Aldridge maintains that, because her taped statement was predicated on those initial, pre-warning statements to the police, the taped statement should be deemed involuntary and, therefore, inadmissible. Second, Aldridge contends that the Commonwealth failed to present sufficient corroborating evidence to prove the *corpus delicti* required for a homicide. Third, Aldridge argues that the trial court erred in finding that the Commonwealth had presented sufficient evidence to show that she acted with premeditation and malice. For the reasons that follow, we disagree and affirm her conviction.

## A. <u>The Motion to Suppress</u>

Initially, the Commonwealth contends that the issue of whether the trial court should have granted Aldridge's motion to suppress is not properly before this Court. The

---

[1] There is apparently no transcript of the hearing where the trial judge made his findings and convicted the defendant, nor is there a written opinion setting forth the judge's findings.

Commonwealth reasons that, because Aldridge did not raise this argument in her initial petition for appeal, we should decline to consider it now. As we have recently noted, however, "nothing in the Rules of Court prevents us from exercising our inherent authority to allow the petitioner to present additional issues for our consideration when we have already acquired jurisdiction and have not yet acted on the original petition." Riner v. Commonwealth, 40 Va. App. 440, 453, 579 S.E.2d 671, 678 (2003), aff'd, 268 Va. 296, 601 S.E.2d 555 (2004). Also, despite the Commonwealth's argument to the contrary, it matters not whether "the tools to form this argument were available at the time of the direct appeal." As we noted in Riner, "we do not consider an actual or alleged change in the law a prerequisite to the court's exercise of its discretion to allow a petitioner to add assignments of error to a timely filed petition." Id. at 454 n.1, 579 S.E.2d at 678 n.1.[2] Accordingly, this Court may exercise its inherent authority to consider the additional issue of whether the trial court should have granted Aldridge's motion to suppress.

Turning to the merits of Aldridge's argument, on appeal of the denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below. McCracken v. Commonwealth, 39 Va. App. 254, 258, 572 S.E.2d 493, 495 (2000) (*en banc*); Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). Although "'[w]e are bound by the trial court's findings of historical fact unless "plainly wrong" or without evidence to support them,' . . . we review *de novo* the trial court's application of legal standards . . . to the particular facts of the case." McCracken, 39 Va. App. at 258, 572

---

[2] Although the Commonwealth correctly points out that the appellant in Riner petitioned this Court for permission to expand his petition for appeal, rather than merely petitioning for permission to brief an additional issue, we find that this is a distinction without a difference. Regardless of which mechanism an appellant chooses to present additional issues to this Court for consideration, we may elect to exercise our inherent authority to hear and decide those issues that we find have sufficient merit.

S.E.2d at 495 (quoting McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997)) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)).  Further, "[i]n reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the appellant] to show that the ruling . . . constituted reversible error.'"  McGee, 25 Va. App. at 197, 487 S.E.2d at 261 (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)).

Also, "[c]onflicts in evidence present factual questions that are to be resolved by the trial court," which "'must evaluate the credibility of the witnesses, resolve the conflicts in their testimony and weigh the evidence as a whole.'"  Mills v. Commonwealth, 14 Va. App. 459, 468, 418 S.E.2d 718, 723 (1992) (quoting Albert v. Commonwealth, 2 Va. App. 734, 738, 347 S.E.2d 534, 536 (1986)).  Thus, "'[t]he credibility of witnesses and the weight accorded their testimony are matters solely for the fact finder who has the opportunity of seeing and hearing the witnesses.'"  Collins v. Commonwealth, 13 Va. App. 177, 179, 409 S.E.2d 175, 176 (1991) (quoting Schneider v. Commonwealth, 230 Va. 379, 382, 337 S.E.2d 735, 736-37 (1985)).  And, "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt."  Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998).

Considering the totality of the evidence presented below, we find no merit in Aldridge's contention that her statements to the police were involuntary because the detectives failed to advise her of her Miranda rights in a timely manner.

"'In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person shall be compelled in any criminal case to be a witness against himself.'"  Missouri v. Seibert, 124 S. Ct. 2601, 2607 (2004) (quoting Bram v. United States, 168 U.S. 532, 542 (1897)) (internal quotations and emphasis omitted).

In Miranda, [the United States Supreme Court] explained that the "voluntariness doctrine in the state cases . . . encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice[.]" [Miranda, 384 U.S. at 464-65]. [The Court] appreciated the difficulty of judicial enquiry *post hoc* into the circumstances of a police interrogation, [Dickerson v. United States, 530 U.S. 428, 444 (2000)], and recognized that "the coercion inherent in *custodial interrogation* blurs the line between voluntary and involuntary statements, and thus heightens the risk" that the privilege against self-incrimination will not be observed[.] [Id. at 435]. Hence [the Court's] concern that the "traditional totality-of-the-circumstances" test posed an "unacceptably great" risk that involuntary *custodial confessions* would escape detection. [Id. at 442].

Accordingly, "to reduce the risk of a coerced confession and to implement the Self-Incrimination Clause," [Chavez v. Martinez, 538 U.S. 760, 790 (2003) (Kenndy, J., concurring in part and dissenting in part)], [the] Court in Miranda concluded that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." [Miranda, 384 U.S. at 467]. Miranda conditioned the admissibility at trial of any *custodial confession* on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.

Id. at 2607-08 (emphases added).

In the United States Supreme Court's recent decision in Seibert, the Court reiterated this premise in the context of its clear disapproval of a "question-first practice of some popularity" among the country's police departments, in which police utilize a technique of interrogating suspects "in successive, unwarned and warned phases" in order to produce a confession, without first having to advise the suspect of Miranda rights. Id. at 2608-09. Specifically, in Seibert, police arrested Seibert, took her to the police station, and then "questioned her without Miranda warnings for 30 to 40 minutes," while "squeezing her arm and repeating" accusatory statements. Id. at 2606. After Seibert confessed, police "turned on a tape recorder, gave Seibert the Miranda warnings, . . . obtained a signed waiver of rights," and then "confronted her with her prewarning

- 15 -

statements." Id. During the suppression hearing, an officer testified "that he made a 'conscious decision' to withhold Miranda warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" Id. Under these circumstances, the United States Supreme Court held that Seibert's post-warning statements were taken in violation of Miranda and should have been suppressed, reasoning that "the question-first tactic effectively threatens to thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted" and that the facts in Seibert's case did not support any conclusion that the warnings ultimately given by police "could have served their purpose." Id. at 2613.

Nevertheless, the Seibert decision is inapposite to the case at bar. In Seibert, the Court explicitly noted that Seibert was "arrest[ed]" and, thus, *in custody* prior to any questioning by police. Id. at 2606. Indeed, the United States Supreme Court has long recognized that Miranda warnings are implicated only during a custodial interrogation. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977). For that reason, "'[p]olice officers are not required to administer Miranda warnings to everyone whom they question,' and Miranda warnings are not required when the interviewee's freedom has not been so restricted as to render him or her 'in custody.'" Harris v. Commonwealth, 27 Va. App. 554, 564, 500 S.E.2d 257, 261-62 (1998) (quoting Mathiason, 429 U.S. at 495) (citation omitted); see also Oregon v. Elstad, 470 U.S. 298, 309 (1985) ("Because Miranda warnings may inhibit persons from giving information, this Court has determined that they need be administered only after the person is taken into 'custody' or his freedom has otherwise been significantly restrained."). The Court's decision in Seibert did not abrogate this long-standing principle. Thus, if a suspect gives an unwarned, voluntary confession *before* being taken into custody, a subsequent confession exacted after the suspect has been taken into custody and informed of his Miranda rights need not be suppressed. See Elstad, 470 U.S. at 313-14.

The question of "[w]hether a suspect is 'in custody' under <u>Miranda</u> is determined by the circumstances of each case, and 'the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.'" <u>Harris</u>, 27 Va. App. at 564, 500 S.E.2d at 262 (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983)) (internal quotations and citation omitted).  That determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994); <u>see also</u> <u>Yarborough v. Alvarado</u>, 124 S. Ct. 2140, 2148 (2004) ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.").  Accordingly, "[i]f a reasonable person in the suspect's position would have understood that he or she was under arrest, then the police are required to provide <u>Miranda</u> warnings before questioning." <u>Harris</u>, 27 Va. App. at 564, 500 S.E.2d at 262.

The circumstances that we consider when determining whether a suspect was "in custody" include:  "(1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual." <u>Id.</u> at 564-65, 500 S.E.2d at 262 (citations omitted).  However, "*[n]o single factor is dispositive of the issue.*" <u>Id.</u> (citing <u>Wass v. Commonwealth</u>, 5 Va. App. 27, 33, 359 S.E.2d 836, 839 (1987)) (emphasis added).

Here, there was nothing coercive or intimidating about the manner in which police "summoned" Aldridge.  Two university police officers, accompanied by a residential assistant, went to Aldridge's dormitory room and asked her if she would mind going with them to speak with a "Norfolk detective."  Aldridge voluntarily went along.  She rode in the front seat of

- 17 -

Sergeant Genwright's unmarked police car, and she was not handcuffed. Sergeant Genwright – who was wearing a shirt and tie rather than a uniform – told Aldridge that "they just want to talk to you," and he never indicated that she was under arrest or that she would be placed under arrest. Also, Sergeant Genwright gave Aldridge his "card" and told her to call him when she was through speaking with the police so that he could "come pick [her] up." Considering all these circumstances, a reasonable person would not have believed that she was in custody when "summoned" by the police in this manner.

It is true that the detectives interviewed Aldridge at the police operations center rather than at a more familiar or neutral place. However, the fact that the detectives asked Aldridge to speak with them at a police facility, rather than her dormitory room, does not automatically convert the meeting into a custodial situation. Indeed, the Supreme Court of Virginia has expressly recognized that "[i]t is the custodial nature *rather than the location of the interrogation* that triggers the necessity for giving <u>Miranda</u> warnings." <u>Coleman v. Commonwealth</u>, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983) (emphasis added). In <u>Mathiason</u>, for example, the United States Supreme Court held that a station house interrogation was not "custodial" where the accused came to the station voluntarily, despite the fact that he was told, falsely, that his fingerprints had been found at the scene of a burglary and that he confessed to the crime only moments later. 429 U.S. at 495. The Court reasoned:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. <u>Miranda</u> warnings are required only where there

- 18 -

has been such a restriction on a person's freedom as to render him "in custody."

Id.

As in Mathiason, there is no evidence on this record from which the trial court could have determined that the location of the police interview would have caused a reasonable person to believe that she was not free to leave. See Coleman, 226 Va. at 37, 47, 307 S.E.2d at 866-67, 873 (finding interview non-custodial where police asked to interview defendant, advised him that he was not under arrest, and interview took place in officer's patrol car, leading to incriminating statements and evidence). The detectives did not arrest Aldridge when she arrived at the station. Instead, they "introduced [themselves]" and told Aldridge that they just wanted to speak with her. Although the detectives placed Aldridge in an interview room and closed the door to that room, the door was not locked, and the detectives told Aldridge that "she could easily knock" if she needed anything. And, although the detectives told Aldridge not to walk around the facility, they also informed her that this precaution was necessary to ensure her safety. Considering all of these circumstances, the location of this police interview does not weigh in favor of finding that Aldridge was in custody for purposes of Miranda.

We likewise find nothing coercive or intimidating in the fact that two detectives interviewed Aldridge at the station. Both detectives were present throughout the entire interview, but there is no evidence that the detectives tried to overwhelm Aldridge or overbear her will with a barrage of questions. Also, the same detectives questioned Aldridge throughout the entire interview process; they did not attempt to confuse or intimidate Aldridge. Moreover, Aldridge offered no testimony indicating that the number of detectives present contributed to any feelings of nervousness or intimidation on her part. Cf. Wass, 5 Va. App. at 34, 359 S.E.2d at 840 (finding interview taken in custodial context where the law enforcement presence resembled a military operation and no reasonable person would have felt free to resist any demand made on

him).  Considering all of the circumstances, the fact that two detectives conducted the interview also does not weigh in favor of finding that Aldridge was in custody when she first began speaking with the police.

Similarly, the duration and character of the initial police interview would not have led a reasonable person to feel that she was not free to leave.  The detectives did not make Aldridge wait for an extended period of time after arriving at the police operations center.  Rather, they placed her in an interview room and began speaking with her within thirty minutes of her arrival.  Also, the initial, pre-warning interview only lasted for approximately thirty minutes.  Although Detective Huffman conceded that he did not specifically tell Aldridge that she was free to leave, he did inform her that she "didn't have to talk to [them] if she didn't want to."  Throughout the interview process, the detectives never raised their voices, and they did not handcuff or otherwise physically restrain Aldridge.  The detectives offered Aldridge food and drink several times, and Detective Huffman told her that she "shouldn't be afraid to talk" because "[a]ll he wanted to do is help [her]."  All in all, the duration and character of this interview appear calculated to set Aldridge at ease rather than to intimidate or coerce her into believing that she was not free to leave.

As to whether the officers manifested any belief of culpability to Aldridge during the interview, a consideration of this factor "encompasses the degree to which it was conveyed to the suspect that he or she was the focus of a criminal investigation," and it also "includes circumstances such as the appearance of probable cause to arrest and the extent to which the individual is confronted with evidence of guilt."  Harris, 27 Va. App. at 566 n.2, 500 S.E.2d at 262 n.2.  As the United States Supreme Court noted in Stansbury,

> [i]t is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda.  The same principle obtains if an officer's

- 20 -

undisclosed assessment is that the person questioned is not a suspect. In either instance, one cannot expect the person under interrogation to probe the officer's innermost thoughts. Save as they are communicated or otherwise manifested to the person being questioned, an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry.

An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "'freedom of action.'" *Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.* The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

Stansbury, 511 U.S. at 324-25 (citations omitted) (emphasis added); see also Ramos v. Commonwealth, 30 Va. App. 365, 370, 516 S.E.2d 737, 740 (1999) ("The point at which an officer develops probable cause does not determine whether a suspect is in custody. Whether the officer developed probable cause earlier than the formal arrest was only one factor to be considered in deciding whether the defendant was in custody before the formal arrest."); Kauffmann v. Commonwealth, 8 Va. App. 400, 404-05, 382 S.E.2d 279, 281 (1989) ("The Miranda warnings are not required merely because . . . the investigation has centered on the person being questioned." (citing Mathiason, 429 U.S. at 495)).

Here, although Detective Huffman agreed that he viewed Aldridge as a potential suspect before the interview began, the record does not suggest that the detectives were certain as to Aldridge's culpability before her initial incriminating statements and the detective's subsequent reading of the Miranda warnings. In fact, Detective Huffman testified that, when the detectives first began speaking with Aldridge, they were not even sure whether a crime had been

committed, much less whether Aldridge was involved. Although Aldridge testified that she did not feel as though she was free to leave because she knew "what [she] [was] going there for," the detectives did not express any belief of guilt to Aldridge herself. And, even if the officers had believed that the interview might ultimately lead to an arrest, this "unarticulated plan" would be of no significance because it was not communicated to Aldridge, the individual being detained. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan [to arrest a suspect] has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.").

Considering the totality of this evidence, we hold that Aldridge was neither formally arrested nor deprived of her freedom of movement until after she made the incriminating statements to the detectives. Accordingly, the detectives were not required to advise Aldridge of her Miranda rights prior to her initial incriminating statements because she was not yet in custody. We therefore hold that the trial court did not err in finding that the detectives acted appropriately and in accord with the protections of Miranda.[3]

## B. Proof of the *Corpus Delicti* of Homicide

Aldridge also asserts on appeal that the Commonwealth failed to produce sufficient evidence to prove the *corpus delicti* of homicide. Where an appellant challenges the sufficiency of the evidence, we review the evidence in the light most favorable to the party prevailing below,

---

[3] Aldridge also asserts on appeal that her post-warning statements were given involuntarily because the detectives did not provide her with Miranda warnings when she first arrived at the station. Aldridge reasons that, because she was in custody when she first arrived at the police station, her pre-Miranda statements were unwarned and, therefore, involuntary. And, because Aldridge's post-Miranda statements were derived from her pre-Miranda statements, she concludes that her post-Miranda statements should be deemed involuntary as well. Because we have held that Aldridge was not in custody prior to the point in time at which the detectives read her the Miranda rights, we decline to address this portion of Aldridge's argument further.

and we will affirm the judgment of the trial court unless plainly wrong or without evidence to support it. Beavers v. Commonwealth, 245 Va. 268, 281-82, 427 S.E.2d 411, 421 (1993); Pugh v. Commonwealth, 223 Va. 663, 666, 292 S.E.2d 339, 340 (1982). Viewing the evidence in the light most favorable to the Commonwealth, the party prevailing below, we hold that the trial court's determination that the Commonwealth presented sufficient evidence to prove the *corpus delicti* of homicide was not plainly wrong or without evidence to support it.

*Corpus delicti* means, literally, "the body of a crime," or "[t]he fact of a transgression." Black's Law Dictionary 346 (7th ed. 1999). In other words, "[t]he *corpus delicti* is the fact that the crime charged has been actually perpetrated." Lucas v. Commonwealth, 201 Va. 599, 603, 112 S.E.2d 915, 918 (1960); see also Claxton v. City of Lynchburg, 15 Va. App. 152, 154, 421 S.E.2d 891, 893 (1992). At its most basic, the *corpus delicti* of a crime includes two elements: (1) the act, and (2) the criminal agency of the act. Claxton, 15 Va. App. at 154, 421 S.E.2d at 893; see also Lucas, 201 Va. at 603, 112 S.E.2d at 918. Thus, the Commonwealth must establish that the alleged offense was attributable to a criminal act, and not to mere accident or chance.

The *corpus delicti* of homicide consists of two components: "(1) the death of the party alleged to have been murdered, and (2) the fact that death resulted from the criminal act or agency of another person." Clark v. Commonwealth, 220 Va. 201, 209, 257 S.E.2d 784, 789 (1979); see also Swann v. Commonwealth, 247 Va. 222, 236, 441 S.E.2d 195, 205 (1994). However, in a prosecution for killing a newborn baby, the Commonwealth must prove not only that the baby died, but also that "the child was born alive and had an independent and separate existence apart from its mother." Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978) (*per curiam*). This rule is premised on the fundamental concept that a defendant cannot be convicted of killing a person who is already dead. Accordingly, to establish the *corpus delicti* of homicide in this case, the Commonwealth was required to present evidence: (1) that

- 23 -

the baby was born alive, established an independent life of its own, and subsequently died; and (2) that the baby's death resulted from Aldridge's criminal conduct.

Here, the Commonwealth introduced Aldridge's confession to the police and her statements to Darlene Griffith, in which Aldridge admitted: (1) that the baby was born alive; (2) that she tied off the baby's umbilical cord; (3) that the baby was still alive after she tied off the umbilical cord; (4) that the baby was still alive when Aldridge submerged her in the water; (5) that she purposefully left the baby underwater, knowing that her actions could lead to the baby's death; and (6) that the baby was no longer alive after Aldridge removed her from the water. This evidence was more than sufficient to prove that the baby was born alive, achieved an independent existence, and died as a result of Aldridge's criminal – rather than accidental – conduct.

We have held, however, that "an extrajudicial confession of an accused that he committed the offense with which he is charged is not, alone and uncorroborated, adequate proof of the *corpus delicti*." Jefferson v. Commonwealth, 6 Va. App. 421, 424, 369 S.E.2d 212, 214 (1988) (citing Phillips v. Commonwealth, 202 Va. 207, 211, 116 S.E.2d 282, 284-85 (1960)). Simply put, we will not convict a defendant based on her confession alone. Rather, the Commonwealth must present corroborative evidence that, "when taken with the evidence of the confession," is sufficient to "prove[] the commission of a crime beyond a reasonable doubt." Claxton, 15 Va. App. at 155, 421 S.E.2d at 893. "The purpose of the corroboration rule is to reduce the possibility of punishing a person for a crime which was never, in fact, committed." Jefferson, 6 Va. App. at 424, 369 S.E.2d at 214 (internal quotations omitted).

"It is not necessary, however, that there be independent corroboration of all the contents of the confession, or even of all the elements of the crime. The requirement of corroboration is limited to the facts constituting the *corpus delicti*." Watkins v. Commonwealth, 238 Va. 341,

- 24 -

348-49, 385 S.E.2d 50, 54 (1989) (citation omitted); see also Roach v. Commonwealth, 251 Va. 324, 344, 468 S.E.2d 98, 110 (1996) ("The Commonwealth need not corroborate an entire confession, but it must corroborate the elements of the *corpus delicti*."). Also, corroborative evidence supporting the *corpus delicti* "may be furnished by circumstantial evidence as readily as by direct evidence." Watkins, 238 Va. at 349, 385 S.E.2d at 54; see also Clark, 220 Va. at 209, 257 S.E.2d at 789.

Moreover, where, as here, "'the commission of the crime has been fully confessed by the accused, only *slight* corroborative evidence is necessary to establish the *corpus delicti*.'" Jefferson, 6 Va. App. at 424, 369 S.E.2d at 214 (quoting Clozza v. Commonwealth, 228 Va. 124, 133, 321 S.E.2d 273, 274 (1984)) (emphasis in original); see also Cherrix v. Commonwealth, 257 Va. 292, 306, 513 S.E.2d 642, 651 (1999); Clagett v. Commonwealth, 252 Va. 79, 92, 472 S.E.2d 263, 270-71 (1996); Watkins, 238 Va. at 348-49, 385 S.E.2d at 54; Lucas, 201 Va. at 604, 112 S.E.2d at 919. Under the circumstances of this case, we hold that the Commonwealth presented sufficient evidence to corroborate Aldridge's confession and, therefore, establish the *corpus delicti* of homicide.

Specifically, to corroborate Aldridge's confession that the baby was born alive and established an independent life of its own, the Commonwealth presented the testimony of Dr. Kinnison. Dr. Kinnison testified that the baby was born full-term, without any apparent defects or abnormalities. Dr. Kinnison noted that she could not find any evidence of internal or external injuries and that she did not find any toxic substances in the baby's blood. Dr. Kinnison also verified that the baby's umbilical cord had been tied off.

Although this evidence is not, in and of itself, conclusive proof that the baby was born alive and established an independent life of her own, "the *corpus delicti* need not be established by evidence independent of the confession, but may be established by both." Reid v.

Commonwealth, 206 Va. 464, 468, 144 S.E.2d 310, 313 (1965); see also Watkins, 238 Va. at 349, 385 S.E.2d at 54 ("The confession is itself competent evidence tending to prove the *corpus delicti*, and all that is required of the Commonwealth in such a case is to present evidence of such circumstances as will, when taken in connection with the confession establish the *corpus delicti* beyond a reasonable doubt."). Here, Dr. Kinnison's testimony presents "slight" corroborative evidence that, when considered in conjunction with Aldridge's statements to Griffith and the police, is sufficient to prove that the baby was born alive, achieved an existence apart from her mother, and then died. Accordingly, the trial court's conclusion that this element had been established beyond a reasonable doubt is not clearly wrong or without evidence to support it.

The Commonwealth also presented sufficient evidence to corroborate Aldridge's confession that the baby died as a result of Aldridge's own criminal actions. Specifically, Dr. Kinnison testified that the baby's death resulted from drowning rather than from natural causes. Dr. Kinnison explained that, because "[t]here are no specific findings to drowning," determining the cause of death in a drowning case generally requires "an examination of a body in addition to circumstances." Cf. Opanowich v. Commonwealth, 196 Va. 342, 355, 83 S.E.2d 432, 440 (1954) ("[Because] [a]n examination of the body of a dead person will not always disclose whether death was from natural causes or by means of violence[,] . . . [t]he circumstances surrounding the cause of death may be inquired into." (internal quotations omitted)). After taking into consideration all of the circumstances in this case, Dr. Kinnison determined that the cause of death was drowning.

Aldridge contends, however, that Dr. Kinnison's testimony cannot be considered as corroborative evidence because, without Aldridge's confession, Dr. Kinnison would have been unable to determine the infant's cause of death. But as the dissent concedes, Dr. Kinnison's opinion "was based on two sources, appellant's confession and the autopsy." Although

Dr. Kinnison considered Aldridge's confession when she determined the baby's cause of death, Dr. Kinnison also testified that she "found nothing inconsistent with the diagnosis of drowning" and that she additionally based her opinion on the lack of "any injuries . . . [or] abnormalities" in the "full-term infant." Dr. Kinnison's testimony, therefore, sufficiently corroborates Aldridge's confession that she caused the baby's death by purposefully submerging the newborn under water while the baby was still alive.

Aldridge also relies on the Virginia Supreme Court's decision in Lane to argue that the Commonwealth failed to establish causation because the medical evidence was insufficient to prove to any degree of medical certainty that the baby died as a result of Aldridge's conduct rather than from natural causes. In Lane, the defendant gave birth to a baby who did not cry, was not breathing, and did not move or open its eyes. Lane, 219 Va. at 510-11, 248 S.E.2d at 781-82. Although there were no signs of violence, airway obstructions, or congenital defects, the physicians who examined the body were unable to ascertain whether the infant's cause of death was from suffocation (from being placed inside of a plastic bag) or from natural causes. Under those circumstances, the Virginia Supreme Court concluded that "[t]o hold that the child's death was caused by the criminal act or acts of the defendant would be contrary to the medical evidence and amount to pure speculation and surmise." Id. at 515, 248 S.E.2d at 784.

Lane, however, differs from the present case in at least one significant respect: Here, Aldridge *confessed* to drowning her baby. The defendant in Lane did not. In Lane, then, the physicians' testimony was the *only* evidence relating to that baby's cause of death. In contrast, because the Commonwealth in this case had a confession from Aldridge in which she admitted that she submerged her baby underwater while the baby was still alive, the Commonwealth only needed to present "slight" additional evidence of causation in order to corroborate that confession. Here, Dr. Kinnison's testimony provided the requisite "slight" corroborating

evidence.  Cf. Clozza, 228 Va. at 133, 321 S.E.2d at 279 (concluding that the defendant's confession had been adequately corroborated even though "the forensic evidence failed to confirm that a rape occurred").

Finally, the Commonwealth also presented sufficient corroborating evidence that Aldridge's conduct was criminal rather than accidental in nature.  As we have already noted, circumstantial evidence may be used to corroborate a full confession.  Here, there is ample corroborating evidence indicating that Aldridge's actions were criminal in nature.

Initially, Aldridge's statement to Darlene Griffith, in which she admitted that she was afraid her parents would be ashamed of her if they knew she was having a baby, is circumstantial proof of criminal agency because it tends to prove that Aldridge had a motive to get rid of her baby.  Also, Aldridge did not wake up her boyfriend or otherwise ask for help while she was having the child, she carefully cleaned up the hotel bathroom and disposed of the soiled towels and bathmats in an outside dumpster, and she informed the nurses at Norfolk General Hospital that she had given her child up for adoption rather than telling them that she had given birth to a stillborn baby.  These efforts to conceal the fact that she had given birth also support the inference that Aldridge's actions were criminal in nature.

Evidence of criminal agency can also be inferred from the fact that Aldridge did not tell anyone – even the baby's father – that she had given birth to a baby who died.  Cf. Warmke v. Commonwealth, 180 S.W.2d 872, 873 (Ky. 1944) (defendant's "failure to notify any one that she had dropped the baby" from a train trestle provided sufficient corroborating evidence of the defendant's criminal agency).  Moreover, "the secretive and unnatural manner in which she disposed of the body of the child," Opanowich, 196 Va. at 357, 83 S.E.2d at 441, gives rise to the inference that Aldridge's actions were criminal in nature, as does her apparent lack of remorse,

evidenced by the fact that she went shopping with her boyfriend after dropping the baby's body off in her dorm room.

For all of these reasons, we hold that the trial court's determination that the Commonwealth had presented sufficient evidence of the *corpus delicti* of killing a newborn baby was not plainly wrong or without evidence to support it.

### C. Sufficient Evidence of Premeditation and Malice

We begin by noting that the trial court clearly believed the version of events Aldridge presented to the police in her taped statement, and it largely discounted Aldridge's trial testimony. "[W]here a trial court sitting without a jury hears witnesses testify and observes their demeanor on the stand, it has the right to believe or disbelieve their statements." Morning v. Commonwealth, 37 Va. App. 679, 686, 561 S.E.2d 23, 26 (2002). Moreover, where the fact finder does not believe the defendant's version of events, it is entitled to "infer that the accused is lying to conceal his guilt." Dowden v. Commonwealth, 260 Va. 459, 469, 536 S.E.2d 437, 442 (2000). We therefore consider Aldridge's claims on appeal within this context and the proper standard of review.

Code § 18.2-32 defines first-degree murder as "any willful, deliberate, and premeditated killing." Generally, a conviction for premeditated murder under this statute requires proof of: "(1) a killing; (2) a reasonable process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." Rhodes v. Commonwealth, 238 Va. 480, 486, 384 S.E.2d 95, 98 (1989). Aldridge contends that the evidence presented at trial was insufficient to prove that she acted with either premeditation or malice. For the reasons that follow, we disagree, and therefore affirm her conviction for first-degree murder.

### 1. Premeditation

"To premeditate means to adopt a specific intent to kill, and that is what distinguishes first and second degree murder." Smith v. Commonwealth, 220 Va. 696, 700, 261 S.E.2d 550, 553 (1980). In other words, "'it is necessary that the killing should have been done on purpose, and not by accident, or without design . . . .'" Epperly v. Commonwealth, 224 Va. 214, 231, 294 S.E.2d 882, 892 (1992) (quoting McDaniel v. Commonwealth, 77 Va. 281, 284 (1883)). Also, "[t]he intention to kill need not exist for any specified length of time prior to the actual killing." Clozza, 228 Va. at 134, 321 S.E.2d at 279 (citing Akers v. Commonwealth, 216 Va. 40, 48, 216 S.E.2d 28, 33 (1975)). Thus, "'[a] design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill.'" Id. (quoting Giarrantano v. Commonwealth, 220 Va. 1064, 1074, 266 S.E.2d 94, 100 (1980)); see also Rhodes, 238 Va. at 485, 384 S.E.2d at 98; Knight v. Commonwealth, 41 Va. App. 617, 623, 587 S.E.2d 736, 739 (2003). The issue of whether a killing was willful, deliberate, and premeditated is a question of fact, Edmonds v. Commonwealth, 229 Va. 303, 308, 329 S.E.2d 807, 811 (1985), that we will not disturb on appeal unless plainly wrong or without evidence to support it.

Because "premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient." Rhodes, 238 Va. at 486, 384 S.E.2d at 98. Circumstantial factors that the fact finder may consider in deciding whether there is sufficient evidence of premeditation and a specific intent to kill include: (1) the brutality of an attack; (2) the disparity in size and strength between the accused and the victim; (3) the concealment of the victim's body; and (4) the defendant's lack of remorse and efforts to avoid detection. Epperly, 224 Va. at 232, 294 S.E.2d at 892; see also Clozza, 228 Va. at 134, 321 S.E.2d at 279. Also, although "motive is not an essential element of the crime, it is relevant

and often most persuasive upon the question of the actor's intent." Epperly, 224 Va. at 232, 294 S.E.2d at 892-93.

Here, Aldridge's conduct belies her claim that she did not formulate the specific intent to kill her baby. Considering, as we must, the evidence in the light most favorable to the Commonwealth, the record demonstrates that Aldridge deliberately submerged her newborn baby underwater, knowing both that the child was alive and that her actions could lead to the infant's death. Under these circumstances, the fact finder was entitled to infer that Aldridge intended the natural and probable consequences of her actions. See Kelly v. Commonwealth, 8 Va. App. 359, 373, 382 S.E.2d 270, 278 (1989).

Aldridge's actions following the baby's death also provide ample circumstantial evidence of her specific intent to kill. Specifically, Aldridge concealed the infant's body so effectively that it was not discovered until almost three months had elapsed. And, in her effort to avoid detection, Aldridge cleaned the hotel bathroom and disposed of the soiled towels and bathmats in an outside dumpster, and she informed the nurses at Norfolk General Hospital that she had given her child up for adoption rather than telling them that she had given birth to a stillborn baby. Cf. Rhodes, 238 Va. at 487, 384 S.E.2d at 99 (reversing conviction for first-degree murder of an infant where the defendant "was guilty of no effort to conceal evidence or avoid the risk of detection and blame," and she "initiated a call for medical help" when she discovered the baby's injuries).

Moreover, the fact that Aldridge went shopping with her boyfriend after leaving the baby's body in her dormitory room demonstrates a decided lack of remorse. And, although Aldridge appeared "distraught" during her police interview, the fact finder could have reasonably concluded that her "emotions were the result of concern for [her] own predicament and not regret over [her] actions." Knight, 41 Va. App. at 626, 587 S.E.2d at 740-41 (affirming conviction for

- 31 -

premeditated murder where, although the defendant "exhibited some emotion during [the police] interview, he also appeared concerned about how other people would view his actions," which "support[ed] a conclusion that [the defendant's] only concern was for himself and not remorse for killing his daughter"); see also Archie v. Commonwealth, 14 Va. App. 684, 690, 420 S.E.2d 718, 721 (1992) (affirming conviction for premeditated murder where the defendant was not visibly upset following the incident and "gave several inconsistent versions of how [her child] had been injured"). Finally, Aldridge's repeated statements that she was afraid people would be ashamed of her provide her with a motive to kill and secretly dispose of the child. These facts provide ample evidence from which the fact finder could infer that Aldridge, at some point before submerging the child in the bathwater, formulated the specific intent to kill her baby.

In arguing that the Commonwealth failed to demonstrate that she acted with the intent to kill, Aldridge relies on our decision in Vaughan v. Commonwealth, 7 Va. App. 665, 376 S.E.2d 801 (1989). In Vaughan, we reversed a conviction for first-degree murder where the defendant, a sixteen-year-old girl, gave birth to a baby, placed the baby on top of a paper bag, and then left the baby alone. Id. at 668, 376 S.E.2d at 802. The defendant later disposed of the baby's body in a dumpster. Id. at 668, 376 S.E.2d at 803. The baby's body was found the following day, and the medical examiner determined that the infant's death was caused by inattention at birth. Id. at 669, 376 S.E.2d at 803. We held that, although a mother has a duty to care for her newborn child, the failure to adhere to that duty will not give rise to a conviction for premeditated murder unless the omission is a result of malice, rather than mere criminal negligence. See id. at 674, 376 S.E.2d at 806. Under the circumstances of that case, because "the record contain[ed] no evidence that [the defendant] knew that a failure to cover the baby, clear his air passages, and tie the umbilical cord could cause the baby's death," we found no evidence of specific intent to kill. Id. at 676, 376 S.E.2d at 807.

Vaughan is inapposite to the present case for at least two reasons. First and foremost, this case does not involve mere nonfeasance, but rather, the deliberate and purposeful act of drowning a child. Aldridge did not place the baby on the side of the bathtub and leave the room, after which the baby slipped into the water and drowned. Rather, the evidence, when taken in the light most favorable to the Commonwealth, indicates that Aldridge purposefully placed the child underwater and left her there to die. Second, unlike the defendant in Vaughan, Aldridge knew that her actions could lead to the infant's death.

Thus, because Aldridge deliberately engaged in conduct that she knew could result in the baby's death, the trial court did not err when it concluded that the record contained sufficient evidence that Aldridge formulated the specific intent to kill before submerging her baby underwater.

## 2. MALICE

"Malice, either express or implied, is the essence of murder." Moxley v. Commonwealth, 195 Va. 151, 157, 77 S.E.2d 389, 393 (1953). "[M]alice is implied by law from any willful, deliberate and cruel act against another, however sudden." Epperly, 224 Va. at 231, 294 S.E.2d at 892 (internal quotations omitted); see also Fletcher v. Commonwealth, 209 Va. 636, 640, 166 S.E.2d 269, 272 (1969) (noting that malice may be inferred from "the intentional doing of a wrongful act without legal justification or excuse"). Accordingly, "[i]n every unlawful killing, if it be unaccompanied by circumstances of palliation, malice is implied from the act of killing." Moxley, 195 Va. at 158, 77 S.E.2d at 393. Also, "[i]t is usually the province of the [fact finder] to decide whether or not malice exists in the killing and thus determine the grade of homicide." Id. at 160, 77 S.E.2d at 394.

Here, there were no mitigating circumstances that would have stripped Aldridge's conduct of its inherent malice. This was not a provoked killing, nor was Aldridge acting in

- 33 -

self-defense.  Rather, as discussed above, Aldridge admitted that she knew her actions could result in the death of her baby, but that she deliberately engaged in those actions because she was worried that people would be ashamed of her.  The trial judge, therefore, did not err in concluding that the Commonwealth had presented sufficient evidence of malice.

Moreover, although Aldridge argues that her "act of trying to revive her child is more so an act of love and an act of regret [than] the actions of a killer holding malice against her victim," her attempted resuscitation cannot negate the existence of the completed crime.

> Anywhere between the conception of the intent and the overt act toward its commission, there is room for repentence [sic]; and the law in its beneficence extends the hand of forgiveness.  But when the evil intent is supplemented by the requisite act toward its commission, the statutory offense is completed.  "A crime once committed may be pardoned, but it cannot be obliterated by repentance."

State v. Hayes, 78 Mo. 307, 317-18 (1883) (quoting 1 Bishop Crim. Law § 732).[4]  Here, Aldridge's repentance came too late:  It cannot erase her actions, nor can it absolve her of responsibility for those actions in a court of law.

For these reasons, we affirm Aldridge's conviction for first-degree murder.

Affirmed.

---

[4] See also United States v. Crowley, 318 F.3d 401, 410 n.3 (2d Cir. 2003) ("[O]rdinarily, once a person has committed acts sufficient to establish criminal liability, his repentance . . . cannot absolve him from guilt."); State v. Feltovic, 147 A. 801, 804 (Conn. 1929) ("The accused cannot [] escape the penalty of his . . . crime by repentance after that crime has been committed."); State v. Baxter, 104 N.E. 331, 332 (Ohio 1914) ("[R]epentance and restitution do not expunge [] guilt."); State v. Grandbouche, 230 P. 338, 343 (Wyo. 1924) ("The crime was committed when the taking occurred, and no subsequent repentance or reparation can wipe that out." (internal quotations omitted)).

Benton, J., dissenting.

I agree with the majority that this Court has the power to consider the additional issues presented by the appellant. We have jurisdiction of the case, and the issue was raised before the case was submitted for decision. I dissent, however, from the rulings that the trial judge did not err in failing to suppress the confession and that the evidence was sufficient to prove the *corpus delicti*.

I.

"[C]ustodial interrogation . . . mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any meaningful way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). In determining whether the interrogation was custodial, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

A reasonable person in Kuturah Aldridge's situation would have understood that she was "in custody" when police questioned her. Indeed, the record contains very little that suggests Aldridge was *not* in custody. The record proved that two police officers employed by a state university went to Aldridge's dormitory and informed Aldridge and her roommate "that a Norfolk detective would like to speak to them . . . at the Norfolk Police Operations Center." The university police officer did not tell the students that they did not have to go or that they could go without being escorted. Instead, he "informed them, would you mind coming down, coming with us to take you down there?" The officers did not transport the girls in the same vehicle; they took Aldridge in one vehicle and her roommate in another. These arrangements suggest circumstances indicating custody and a need for security.

The record clearly demonstrated that early on, Aldridge was a suspect in the baby's possible homicide and that the police were preparing for her interrogation. At the police

- 35 -

operations center, Detective Huffman, who had investigated the discovery of the baby's body and learned Aldridge had rented the storage unit, met the university police. Detective Huffman told Aldridge and her roommate that he and Detective Newman "wanted to speak to them." The two detectives took the students through a side door into a secure part of the building not accessible to the public, where they again separated them. They put Aldridge in a room alone, closed the door, and did not tell her she could leave or that she was not under arrest. Indeed, suggesting she could not leave, they told her "she couldn't just walk about freely because it was a secured facility . . . but that she could . . . knock and . . . ask . . . [for] anything that she needed." The detectives told her they would "be there to talk . . . in a short period of time" and exited the room.

After thirty-eight minutes, Detectives Huffman and Newman entered the room and for the first time told Aldridge why she had been detained. They "began to advise . . . Aldridge of what [they] had been doing that day regarding the storage unit and [their] discovery." The detectives recalled telling her in some fashion that they "wanted to talk to her about this but she didn't have to talk to [them] if she didn't want to." Detective Huffman testified he was "speculating" about what he said because he could not recall the precise words he used. He did not recall telling Aldridge she was free to leave. He did clearly recall, however, that they interrogated Aldridge about these events and failed to give her <u>Miranda</u> warnings during the first thirty-two minutes of questioning. The interrogation was not recorded.

I would hold that this evidence proved Aldridge did not voluntarily go to the interrogation. Instead, the university police officers delivered her to the Norfolk detectives after she acquiesced to the uniformed police officer's direction to accompany him. She was not told that she could refuse to go; she was not told she was not being detained. When the university police delivered her to the detectives, the detectives likewise did not tell her she was not being

detained or that she was free to leave. Indeed, the detectives explicitly told her she could not leave. For thirty-eight minutes prior to the beginning of the interrogation Aldridge remained in a confined room within a secured area of the police operations center. I would hold that, under these facts, a reasonable person would understand herself to be in custody and deprived of her freedom of action. Thus, I would hold that the trial judge erred in failing to suppress Aldridge's pre-warning statements.

I would further hold that the interrogation tactic the detectives used in Aldridge's case, known as the "question first" technique, made the <u>Miranda</u> warnings ineffective, and, thus, the trial judge erred in failing to suppress her post-warning confession.

The United States Supreme Court held in <u>Miranda</u>, 384 U.S. at 444, that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." A person in police custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." <u>Id.</u> To implement these protections of the Fifth Amendment, the Supreme Court explained in <u>Miranda</u>, that the "voluntariness doctrine . . . encompasses all interrogation practices which are likely to exert such pressure on an individual as to disable him from making a free and rational choice." 384 U.S. at 464-65.

Recently the Supreme Court examined the constitutionality of this "question first" interrogation practice, which Detective Huffman describes as "standard procedure," and rejected it as a violation of the <u>Miranda</u> doctrine.

> This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of

Miranda v. Arizona, 384 U.S. 436 (1966), the interrogating officer follows it with Miranda warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with Miranda's constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.

Missouri v. Seibert, 124 S. Ct. 2601, 2605 (2004).

The "question first" technique makes Miranda warnings ineffective, because when the "warnings are inserted in the midst of a coordinated and continuing interrogation, they are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" Id. at 2611 (quoting Moran v. Burbine, 475 U.S. 412, 424 (1986)). The Court expressly held in Seibert that the object of the "standard procedure," which the detectives used in this case, "is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 2610. The unlawfulness of the "question first" technique was as evident here as it was in Seibert, where the following occurred:

> [T]he facts here, . . . by any objective measure[,] reveal a police strategy adapted to undermine the Miranda warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the Miranda warnings, he said nothing to counter the probable misimpression that the advice that anything [the accused] said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the] Officer . . . set the scene by saying

- 38 -

> "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

Id. at 2612-13 (footnotes omitted).

The similarities between Aldridge's case and Seibert are obvious. The detective's decision not to inform Aldridge of her Miranda rights was purposeful. Detective Huffman testified that their "standard procedure" was to question persons, secure information, give Miranda warnings, and then reduce the information to writing. Detective Huffman testified that during this unwarned interrogation Aldridge admitted delivering the baby, told the detectives that the baby was "stillborn and not alive," and explained her actions. After thirty minutes of unwarned interrogation, they left Aldridge in the room alone. "She was distraught." Forty minutes later, they reentered the room, gave her Miranda warnings, and continued the interrogation. The detective testified that after Aldridge signed the form indicating she had received Miranda rights and wished to waive her Miranda rights, Aldridge said she wanted "to continue talking . . . about what had happened." The detective testified that they then "went over this a little more." As the detectives further questioned her, Aldridge began to describe in detail the events and for the first time "basically came to a point where she stated that, in fact, when she gave birth, that the baby was moving." After the detectives "went over this a little more, [they] actually put on a tape recorder and advised her again that [they] were just going to take a taped statement of what she had already told [them]." Later, Aldridge signed a transcription of the taped statement.

- 39 -

On this evidence, "there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." Seibert, 124 S. Ct. at 2610. Put simply, the "standard procedure" the detectives used to extract the statement from Aldridge "is designed to circumvent Miranda." Id. at 2614 (Kennedy, J., concurring). By any objective measure, Aldridge's statements were made without proper Miranda warnings and are inadmissible as evidence. Dean v. Commonwealth, 209 Va. 666, 667-68, 166 S.E.2d 228, 230 (1969). I would hold that the technique the detectives used violated Miranda, that the warnings were ineffective, and that the trial judge erred in admitting Aldridge's confession.

II.

The principle is well established that, in every criminal prosecution the Commonwealth must prove beyond a reasonable doubt the element of *corpus delicti* ["that is, the fact that the crime charged has actually been perpetrated"] and the accused was the person who committed the crime. Maughs v. City of Charlottesville, 181 Va. 117, 120, 23 S.E.2d 784, 786 (1943). Thus, in any prosecution for the killing of a newborn baby, the Commonwealth must prove beyond a reasonable doubt (1) that the baby was born alive, (2) that the baby achieved an independent and separate existence from its mother, (3) that the baby died as a result of a criminal act, and (4) that the accused was the criminal agent. Lane v. Commonwealth, 219 Va. 509, 514, 248 S.E.2d 781, 783 (1978); Vaughan v. Commonwealth, 7 Va. App. 665, 671, 376 S.E.2d 801, 804 (1989).

Equally well established is the principle that an accused cannot be convicted solely upon her uncorroborated extrajudicial confession. Phillips v. Commonwealth, 202 Va. 207, 210-11, 116 S.E.2d 282, 284 (1960). Although "[t]he Commonwealth need not corroborate an entire confession, . . . it must corroborate the elements of the *corpus delicti*." Roach v.

- 40 -

Commonwealth, 251 Va. 324, 344, 468 S.E.2d 98, 110 (1996). In addition, "[t]he confession must be corroborated . . . by evidence *aliunde* of the *corpus delicti*." Phillips, 202 Va. at 211, 116 S.E.2d at 284. See also Roach, 251 Va. at 344, 468 S.E.2d at 110 (finding that the *corpus delicti* "was . . . corroborated by evidence independent of [the] confession"); Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989) (holding "that there must be independent corroboration of . . . the facts constituting the *corpus delicti*"). Thus, even when the accused has fully confessed, the Commonwealth must still produce "slight evidence to establish the *corpus delicti*." Lucas v. Commonwealth, 201 Va. 599, 603, 112 S.E.2d 915, 918 (1960). Accord Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999).[5]

The Commonwealth failed to corroborate Aldridge's confession by evidence from another source of the *corpus delicti*. Dr. Elizabeth Kinnison, the assistant chief medical examiner, conducted the autopsy four months after the baby's birth and testified that the autopsy was limited by the body's severe decomposition and could not prove the baby drowned. Indeed, her testimony established that the autopsy did not point to any cause of death. For example, Dr. Kinnison testified that ordinarily lungs that floated upon being immersed in water is a circumstance that indicates a baby was breathing at birth. In this case, however, although the baby's lungs floated, Dr. Kinnison testified, she "would have expected them to float from decomposition. So that doesn't help . . . in determining whether the baby was born alive or dead." She further testified: "If for example a baby was found and looked just like this baby, no, I would not have been able to determine what the cause of death was." Indeed, Dr. Kinnison

---

[5] The historic rationale for the rule are several: (1) the danger the confession will be misreported or misconstrued, (2) the danger the confession will be untrustworthy because of improper police procedures, (3) the possibility the accused may be mistaken in the confession either as to the law or the facts, and (4) the danger the confession is false because of psychological reasons. See State v. Aten, 927 P.2d 210, 219 (Wash. 1996) (citing Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U. Pa. L. Rev. 638 (1955)). Several of these factors are implicated by the facts of this case.

testified, that she "never [found] anything specific to drowning" and that "the autopsy alone doesn't exclude drowning. It's consistent with drowning but it could be something else."

Despite these autopsy limitations, Dr. Kinnison opined that the baby died as a result of drowning. She testified, however, that her opinion was based on two sources, Aldridge's confession and the inconclusive autopsy. In part, she testified as follows:

> Q. Now isn't it fair to say there was nothing obvious about this baby's body that on its own told you that it had drowned from finding water in the lungs or anything that you found on the body during the autopsy?
>
> A. Physically, because the baby was so decomposed, it was difficult to determine anything apart from that I didn't find any injuries, the baby looked fully formed, it looked like full term baby.
>
> Q. So it is fair to say that without what information was provided by the police, you can't say how the baby died?
>
> A. In this case, that's fair to say.
>
> Q. So there is really no cause of death that you can determine from the autopsy, but rather you indicate a cause of death based on what information was provided by the police; is that correct?
>
> A. Well, I commonly have to take into account other information in addition to my autopsy finding to determine a cause of death.
>
> Q. Now, you can't say whether or not the baby was born alive based on your autopsy?
>
> A. Based just solely on the autopsy, no, I cannot.

Most significantly, Dr. Kinnison concedes in her own testimony that in the absence of Aldridge's statement to the police, her autopsy and investigation would have led her to the conclusion that "the cause of death was undetermined."

Dr. Kinnison, therefore, only provided speculative testimony regarding the *corpus delicti*. Her ability to provide corroborating evidence was further limited because, as she frankly admitted during her testimony, obstetrics is outside her area of expertise. She testified: "I don't

know a whole lot about delivering babies. So this is just a little bit beyond my area of expertise." Because of this lack of expertise, she could not form an opinion about why the baby did not cry or make other sounds after birth. When questioned about the baby's failure to cry, Dr. Kinnison testified, "These are probably questions that would be better asked to an obstetrician who actually delivers children and sees them right at the birthing process." Similarly, she could not identify the significance of the baby's bluish color at birth, and whether the baby's color indicated the baby was alive, dead, or suffering and dying from anoxia due to blocked air passages. She testifies quite plainly that it was "within the realm of possibility that the baby died from some undetermined anoxic event," a condition about which she knows quite little. The lack of meaningful results from the autopsy underscores what is obvious from the transcript: Dr. Kinnison merely relied upon and repeated Aldridge's confession that the baby drowned as a result of being submerged in the bath.

The trial judge's questions provide a brief overview of Dr. Kinnison's testimony.

Q. The reasonable degree of medical certainty you're relying upon is the confession given by the defendant. You determined that this child first of all born alive, and secondly, died as a result of drowning?

A. Yes.

Q. And it is within acceptable standards to utilize those factors as part of your determination as to what the cause of death was in this particular case?

A. Yes.

Q. If you were given information that the baby was born stillborn and arms and legs were not moving, and you still had the same physical findings as you report on this report of autopsy, the result would have been—in terms of a finding?

A. I would have said undetermined. I can't tell whether the baby died in utero. It could have died during the birthing process. It could have been drowned in the toilet. It could have been smothered.

- 43 -

Q.  So in essence, the finding survived or failed based upon the confession?

A.  In combination with the fact that I have a normal, although, decomposed baby.

Q.  Because there's nothing inconsistent with that confession within this report?

A.  There's nothing inconsistent.

Q.  There are some things which are consistent with it?

A.  Yes.  There was a full term baby and was moving.

\* \* \* \* \* \* \*

THE COURT:  Just one question I need to ask you.  Let me ask you this.

But for the statement made by the defendant, you wouldn't know if this baby was born alive?

THE WITNESS:  That's correct.

To corroborate means "to support or confirm by new evidence."  Am. Heritage Dictionary (2nd ed. Houghton Mifflin 1991).  "Corroborating evidence" is evidence that "differs from but strengthens or confirms other evidence."  Black's Law Dictionary, (West 7th ed. 1999).  The corroboration requirement exists to establish the accused's guilt beyond a reasonable doubt.  In Aldridge's case, proper corroboration would have confirmed that placing the baby in the bathtub led to the baby's death, and not that it died from "some undetermined anoxic event."  Because no determinations flowed from the autopsy, the "corroboration" in this case was simply a repetition of Aldridge's statement.  Obviously, Dr. Kinnison's reliance on Aldridge's confession to support her conclusion of drowning is not corroboration of the confession.  The logical fallacy of relying on Dr. Kinnison's testimony is summarized in Grimes v. State, 51 S.E.2d 797, 801 (Ga. 1979):  "To hold that a confession, in the absence of independent evidence to establish the corpus delicti, could be used to itself establish the corpus delicti, would

- 44 -

necessarily have the effect of ruling that a person could be convicted on his uncorroborated confession, by simply using the confession to corroborate the confession."

Another difficulty with accepting Dr. Kinnison's testimony as "corroborating evidence" is that it does not support a finding that criminality caused the baby's death. The Supreme Court of Washington confronted this same issue in State v. Aten, 927 P.2d 210 (Wash. 1996), where a defendant confessed to suffocating a four-month-old infant she was babysitting and was convicted of manslaughter. 927 P.2d at 218. The State sought to rely on an inconclusive autopsy to corroborate the defendant's confession. The doctor who performed the autopsy could not determine from the autopsy whether the baby's acute respiratory failure was caused by Sudden Infant Death Syndrome or by suffocation. Id. at 220. Noting that this evidence proved the baby's death could have been from either cause, the court held "there was insufficient evidence independent of [the defendant's] statements to establish the corpus delicti." Id. at 221. As in Aten, the autopsy and Dr. Kinnison's testimony provide no basis upon which to infer criminality.

Dr. Kinnison's inability to draw meaningful conclusions from the autopsy, to identify drowning as the cause of death, and to rule out anoxia as a possible cause of death highlights the fact that her determination that the baby drowned was based on Aldridge's account alone and her own speculation. Her testimony was not based on her analysis of corroborative evidence and did not provide corroborative evidence. The record is devoid of even slight corroboration of the confession "by evidence aliunde of the *corpus delicti*." Phillips, 202 Va. at 211, 116 S.E.2d at 284.

As in this case, the baby in the Lane case was born full term without birth defects. There, the doctors expressly found that it was "pure speculation" that the baby died as a result of being placed in a plastic bag. Lane, 219 Va. at 512, 248 S.E.2d at 782. Dr. Kinnison's testimony here

is of the same quality. She would speculate but for the cause she gleaned from Aldridge's confession. Because "there is no evidence that fortifies the truth of the confession that the criminal act was committed," id., the evidence in this case was insufficient to prove beyond a reasonable doubt that the baby was born alive, that the baby had achieved a separate and independent existence, and that the baby died as a result of a criminal act.

For these reasons, I would reverse the conviction.